**EL PASO INDEPENDENT SCHOOL DISTRICT,**

v.

**ROBERT W. By Next Friend JUDY W.**

**No. EP–94–CA–156–DB.**

United States District Court, W.D. Texas, El Paso Division.

Aug. 18, 1995.

**444**

Steven Hughes, El Paso, TX, for plaintiff.

Evelina Ortega, El Paso, TX, for defendant.

## MEMORANDUM OPINION AND ORDER

BRIONES, District Judge.

On this day, the Court considered El Paso Independent School District's complaint for declaratory relief under the authority of the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. §§ 1400 *et seq.*, in the above-captioned cause. This action is an appeal for review from an adverse decision of an administrative hearing officer.

### STANDARD OF REVIEW

A district court shall review the record of the Texas Education Agency administrative proceeding, shall hear additional evidence at the request of either party, and base its decision on the preponderance of the evidence.[1]

### FACTUAL AND PROCEDURAL BACKGROUND

El Paso Independent School District ("EPISD") is a public school district receiving federal funds from the United States Department of Education pursuant to the IDEA.[2] EPISD is required to provide special education services to students with disabilities residing within the district.

Robert W. ("Robert") is 14 years old and has been a student in EPISD since 1987. Since 1987, Robert has been eligible for and has received special education services under the provisions of IDEA because he has been evaluated at different times as learning disabled, speech handicapped, other health impaired, and emotionally disturbed. Robert was held back his first year. Since then, he has received his education in a Behavioral Intervention Class setting ("BIC"). Robert attended grades 2 through 6 at Roberts Elementary School. He began attending Lincoln Middle School for the 1993–94 school year.

Special education students must be evaluated and their placement assessed at least annually.[3] In January of 1994, EPISD eval-

---

1. 20 U.S.C. § 1415(e)(2).

2. The IDEA mandates that a state must provide all handicapped children a "free appropriate public education" in return for federal funding. 20 U.S.C. § 1412(1).

3. 20 U.S.C. §§ 1401(9), 1414(a)(5).

uated Robert and found that Robert was again eligible for special education services because he was emotionally disturbed and speech handicapped. An individualized Education Plan ("IEP") was prepared for Robert at his Admission, Review, and Dismissal Committee ("ARD Committee") meetings held January 15 and 20, 1994.[4] The ARD Committee, through the IEP, decided that Robert's educational services would be provided at Lincoln Middle School. Robert was to continue his social studies and science classes in the BIC classroom; mathematics, language, and reading in the resource room; and art and P.E. in the mainstream setting. His instructional modifications included oral testing, modified testing, extended time, shortened assignments, modified assignments, peer tutoring, pre-test review, reduced paper/pencil tasks, preferential seating, cooling off period, a behavioral management system, instruction in small segments, and repetition of oral directions. Robert was to achieve a mastery level of 70% in all subjects. Related services included speech therapy once a week and counseling by a special education counselor once a week; a behavioral management plan was developed, with Robert's BIC teacher and aide establishing what disciplinary actions would be appropriate when Robert misbehaved, ranging from loss of points, time-out, and isolation, to in-school suspension. A full-time aide was assigned to help Robert. Except for Judy W., all the voting members of the ARD Committee agreed with the IEP and Robert's placement. Judy W. disagreed with this placement determination and requested residential placement in a residential treatment center. Judy W., through her attorney, requested that the Texas Education Agency ("TEA") convene a due process hearing pursuant to 20 U.S.C. § 1415(b)(2).

On March 11, 12, and 21, 1994, a due process hearing was convened. Jed I. Oliver, special education hearing officer for the State of Texas, presided over the hearing. It was Judy W.'s contention that EPISD had deprived Robert of a free appropriate public education by refusing to place him in a resi-

dential treatment center. In an opinion dated April 19, 1994, the hearing officer ruled that Robert was not receiving reasonable educational benefit from his placement, ordered that Robert be residentially placed, and ordered the ARD Committee to determine time guidelines and transitional plans and services for Robert's reintegration into public school after residential placement ended.

EPISD appealed the decision of the administrative hearing officer on May 18, 1994, pursuant to 20 U.S.C. § 1415(e)(2). June 13, 1994, Robert W. filed his answer and counterclaim requesting immediate enforcement of the Opinion of Hearing Officer and attorney's fees. On August 8, 1994 EPISD filed its brief on the merits and on September 9, 1994, Robert W. filed his response and brief on the merits. The three volume record of the administrative hearing is on file with the Court. Oral arguments of the parties were heard on December 6, 1994 at which time the Court took the appeal under advisement and commenced reviewing the entire record. No new evidence was put forth at the hearing.

EPISD seeks an order from this Court vacating the Opinion of the Hearing Officer and a declaration either that the special education placement and services provided by EPISD to Robert are reasonably calculated to provide Robert with meaningful educational benefit, or in the alternative, that there are less restrictive alternatives to residential placement in which Robert can receive meaningful educational benefit.

**DISCUSSION**

The case law on this subject in the Fifth Circuit follows the controlling Supreme Court case *Board of Educ. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In *Rowley,* the Supreme Court interpreted both the procedural and substantive requirements of the Act for the first time. The case sheds valuable light on the subject before this Court and is directly on point;

4. The school child and his parents are entitled to be involved in the process of developing an IEP, together with the child's teachers and various

school district professionals who make up the ARD Committee. *See generally,* 20 U.S.C. § 1401(20).

therefore, it is the Court's opinion that this case is governed by *Rowley*.

The *Rowley* case involved a deaf student named Amy Rowley who had minimal residual hearing and was an excellent lip reader. After successfully completing her kindergarten year in a regular classroom with above average grades, an IEP was drafted for the fall of Amy's first-grade year. The Rowleys agreed with most of the IEP but insisted that Amy also be provided a qualified sign-language interpreter in all her academic classes instead of the assistance proposed in other parts of the IEP. When the Rowleys' request for an interpreter was denied, they demanded and received a hearing before an independent examiner. The examiner agreed with the administrators' determination that an interpreter was not necessary because she was achieving educationally, academically, and socially without the assistance of an interpreter. The Rowleys then brought an action in the District Court pursuant to the Act's provision for judicial review claiming that the administrators' denial of the interpreter constituted a denial of the "free appropriate public education" mandated by the Act. *Rowley*, 458 U.S. at 184–5, 102 S.Ct. at 3039–40.

The District Court found that Amy was not receiving a "free appropriate public education" which the court interpreted as " 'an opportunity to achieve [her] full potential commensurate with the opportunity provided to other children.' " *Id.* at 186, 102 S.Ct. at 3040. The Second Circuit affirmed the District Court and the Supreme Court granted *certiorari*.

The Supreme Court considered two questions: "What is meant by the Act's requirement of a 'free appropriate public education'? And what is the role of state and federal courts in exercising the review granted by 20 U.S.C. § 1415?" *Id.* at 186, 102 S.Ct. at 3040.

### I. Free Appropriate Education

In *Rowley*, the District Court and the Court of Appeals stated that the Act does not define the term "free appropriate education." *Id.* at 187, 102 S.Ct. at 3041. Robert W. asserts the same in the case at bar. (Df. brief p. 15) However, the Supreme Court,

and this Court, recognizes that the Act expressly defines "free appropriate public education":

> The term 'free appropriate public education' means special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(18).

"Special education" means "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and instruction in physical education." 20 U.S.C. § 1401(16). "Related services" are defined as "transportation, and such developmental corrective, and other supportive services ... as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(17).

■ Therefore, "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a 'free appropriate education' as defined by the Act." *Rowley*, 458 U.S. at 189, 102 S.Ct. at 3042. The majority went on to state,

> Noticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children. Certainly the language of the statute contains no requirement like the one imposed by the lower courts—that States *maximize* the potential of handicapped children "commensurate with the opportunity provided to other children." (emphasis added).

*Id.* at 189–90, 102 S.Ct. at 3042. "The intent of the Act was more to open the door of

public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192, 102 S.Ct. at 3043. After analyzing the legislative history surrounding the Act, the Court reiterated that "whatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education." *Id.* at 197 n. 21, 102 S.Ct. at 3046 n. 21; *see also, Teague Indep. Sch. Dist. v. Todd L.,* 999 F.2d 127, 128 (5th Cir.1993). Rather, the Act was designed to provide a "basic floor of opportunity" consistent with equal protection; Congress intended it to require nothing more than equal access. *Rowley,* 458 U.S. at 200, 102 S.Ct. at 3047. Neither did Congress intend to impose upon the States "any greater substantive education standard than would be necessary to make such access meaningful." *Id.* at 192, 102 S.Ct. at 3043. Clearly, the majority expressly disagreed with the holdings of the lower courts. "Free appropriate education" is defined in the Act and it does not require that services provided under the Act be calculated to maximize each child's potential but that the education to which access is provided be sufficient to confer some educational benefit upon the disabled child. "Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education." *Id.* at 200, 102 S.Ct. at 3048.

So, on the issue of "free appropriate education" the Supreme Court concluded that the State satisfies this requirement by

> providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.... [T]he IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Id.* at 203–4, 102 S.Ct. at 3049.

## II. District Court Review

As stated above, IDEA provides that a court "shall receive the record of the [State] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

The *Rowley* Court cautioned reviewing courts:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation for the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.... The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that **due weight shall be given to these proceedings.** (emphasis added).

*Id.* at 206, 102 S.Ct. at 3051.

■ In suits brought pursuant to IDEA, a court must decide two things: (1) Has the State complied with statutory procedures? (2) Is the individualized program developed through such procedures reasonably calculated to enable the child to receive educational benefits? "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207, 102 S.Ct. at 3051.

It is important to note that at this point in the *Rowley* opinion, a footnote says the achievement of passing marks and advancement from grade to grade is one important factor in determining educational benefit to a disabled child who is being educated in the regular classroom setting. *Id.* n. 28. This is the closest the Court comes to explaining "educational benefit." It is implied that other factors are to be considered and that "passing" is just one, albeit important, factor. The Court explicitly stated that they were not attempting "to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." *Id.* at 202, 102 S.Ct. at 3049.

### III.   Least Restrictive Environment

The issue of least restrictive environment or "mainstreaming" is treated briefly by *Rowley*. Amy Rowley was not facing removal from a classroom filled with her nondisabled peers. However, Robert is facing that possibility and so it is highly relevant.

Title 20 U.S.C. § 1412(5)(B) requires that a State establish

procedures to assure that, to the **maximum extent** appropriate, children with disabilities, including children in public or private institutions or other care facilities, **are educated with children who are not disabled,** and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services **cannot be achieved** satisfactorily. (emphasis added).

*See also, Rowley,* 458 U.S. at 202, 102 S.Ct. at 3048–49; *Teague Indep. Sch. Dist.,* 999 F.2d at 128; *Sherri A.D. v. Kirby,* 975 F.2d 193, 206 (5th Cir.1992).

Under the Texas Education Code, Title 2 Section 21.501, the State Board of Education is required to develop and implement a state-wide plan which:

includes procedures designed to: ensure that an individualized education plan for each handicapped student is properly developed, implemented, and maintained in **the least restrictive environment** which is appropriate to meet the student's educational needs. (emphasis added).

■ In *Teague*, the Fifth Circuit held that under the Act, "in addition to requiring that the child's placement be appropriate in the sense of providing some benefit, IDEA mandates that to the fullest extent possible, disabled children be educated with non-disabled children in the least restrictive environment." *Teague Indep. Sch. Dist.* 999 F.2d at 132,

*citing generally,* 20 U.S.C. § 1412(5); *Rowley,* 458 U.S. at 202, 102 S.Ct. at 3048–49; *Sherri A.D.,* 975 F.2d at 206. "Even in cases in which mainstreaming is not a feasible alternative, there is a statutory preference for serving disabled individuals in the setting which is least restrictive of their liberty." *Sherri A.D.,* 975 F.2d at 206.

### IV.   Robert W.

**A.   Has EPISD complied with statutory procedures?**   Robert is a student with a disability and his access to a free appropriate education is guaranteed under IDEA. Robert has had his placement, his IEP, and his overall progress assessed at least annually as required by the Act. His mother, his legal representative, and all of the education professionals required were present at his ARD Committee meetings for the development of his IEPs. When Robert's mother did not agree to his proposed IEP, she requested a due process hearing and was afforded one under the provisions of the Act. After the hearing, the adversely affected party, EPISD, initiated this lawsuit according to those same statutory provisions. In the judgment of the Court, the State has complied with the statutory procedures required by IDEA.[5]

**B.   Is the individualized program developed through such procedures reasonably calculated to enable Robert to receive educational benefits?**   This Court believes so. Because each child's needs are unique, the Supreme Court did not and could not define what constitutes educational benefit with any brightline rule. Each child must be evaluated individually. There is no question that Robert is a child with real disabilities. The record has abundant evidence of his need for close supervision and a structured environment. However, it is the Court's opinion that Robert can receive meaningful educational benefit in a less restrictive environment than residential placement.

The hearing officer cites the applicable law and, for the most part, the Court agrees with

---

5.   The hearing officer did not make any findings of fact or conclusions of law concerning any procedural error. The Brief on the Merits filed by EPISD raises the issue, agrees that the hearings officer was proper in not making any findings or conclusions, and probably mentions it only in anticipation of the Defendants raising it. However, the Defendants do not address the issue of procedural due process at all.

his interpretations. However, the hearing officer incorrectly applied the law to some of the facts leading him to the conclusion that Robert could not benefit from an education provided anywhere but a residential treatment center.

■ First and foremost, the administrative hearing officer was in error when he decided that Robert was not receiving meaningful educational benefit from his IEP because of the "widening gap" between Robert and his non-disabled peers. This is not the proper evaluation. The District Court in *Rowley* was applying this same standard to Amy Rowley's progress. The District Court found that Amy

> 'understands considerably less of what goes on in class than she could if she were not deaf' and thus 'is not learning as much, or performing as well academically, as she would without her handicap.' ... This disparity between Amy's achievement and her potential led the court to decide that she was not receiving a 'free appropriate public education,' which the court defined as 'an opportunity to achieve [her] full potential **commensurate with the opportunity provided to other children.'** According to the District Court, such a standard 'requires that the potential of the handicapped child be measured and compared to his or her performance, **and that the resulting differential or "shortfall" be compared to the shortfall experienced by nonhandicapped children.'** (emphasis added).

*Rowley,* 458 U.S. at 185–6, 102 S.Ct. at 3040.

The hearing officer evaluated the evidence of Robert's progress as measured by the Woodcock–Johnson (an educational diagnostic test) [6] as regression because, although it was an increase, it also represented a "widening gap" between Robert and his age peers. Specifically, the hearing officer found,

> Robert's highest strength measured by the Woodcock–Johnson was in Math where he increased grade level equivalencies by 2.8 years in a 3.3 year span.... In the same

3.3 years, his grade level in written expression increased only 1.6 grade levels from 1.3 to 2.9. Does this *per se* increase constitute educational progress? Reasonable educational progress? It can also be expressed without using the word 'increase.' The scores can also constitute a regression, i.e., in 3.3 years, this boy with average intelligence (TONI—95) fell another .1.7 years behind his age peers.

(H.O.Op. 10–11.)

The Supreme Court in *Rowley* repeatedly stated that the State was not required to maximize a handicapped child's potential "commensurate with the opportunity provided to other children." A child, an individual with unique problems, cannot be held up and compared to non-disabled children. This is simply not a reasonable standard. The question is, does Robert receive any meaningful benefit from his individual education plan? It must be meaningful for Robert; whether this benefit would be meaningful for his age peers is irrelevant. Reasonable progress for Robert may be completely unreasonable for his age peers. So, the "widening gap" standard is not appropriate. The hearing officer accurately stated the principles of *Rowley* and promptly reversed course and held that Robert was not getting meaningful benefit from his education because he was not "catching up" (the opposite, perhaps, of the "widening gap") with his peers. Robert must be getting meaningful educational benefit without regard to what his peers are doing.

The hearing officer apparently created a new standard when he held that the school district:

> should not be shielded from allegations of inappropriateness of the behavioral IEPs and the educational program addressing his academic weakness solely because they can prove that he has made some educational progress in areas of his strengths. He is not in special education because of his strengths. His IEP, to be appropriate, must consider also his weaknesses, and the IEPs must be designed and implemented

6. This is one case where it is not possible to determine Robert's progress by looking solely at

"grades." Robert does receive passing grades and is advancing from grade to grade.

in a way calculated to render meaningful progress to him in those areas. (H.O.Op. 10.)

■ The Court is not sure on what the hearing officer based this assertion. There is no precedent cited for the proposition that progress in areas of demonstrated strength is somehow not good evidence of meaningful benefit. This Court is prepared to hold that, on the contrary, evidence of progress should be considered without regard to strengths and weaknesses when determining whether or not a child is receiving meaningful benefit and therefore an appropriate education. Clearly, Robert has shown progress across the board, although in differing degrees. His progress is not maximal, but neither is it minimal. Distinguishing between progress in strong areas and weak areas is not a helpful analysis. It is true that Robert is not improving as much in written progression as he is in math skills. However, even non-disabled students often show an aptitude for some subjects and not others. It is absolutely true that Robert's IEPs should be calculated to benefit him in both strong and weak areas. Nevertheless, evidence of educational benefit is not limited to progress in a student's weak areas. All progress should be considered without such distinctions. The standards espoused by the hearing officer come dangerously close to requiring EPISD to maximize Robert's potential; while it is a noble goal, it is not the law.

■ The hearing officer also discussed Robert's emotional disturbance, behavior and Behavior Modification Plan in relation to his educational benefit. The hearing officer correctly states that Robert has made little progress in behavioral areas (Peer Relations, On-task Behaviors, Motivation and Coping, Adult/Authority Figure Relations, and Behavioral Management). These areas have been defined as IEP goals by Robert's ARD Committee. Robert's behavioral and emotional problems are, for the most part, his disability. However, as the hearing officer states, EPISD cannot be charged with the burden of remediating Robert's disability. The hearing officer's concern is that Robert's IEPs have not varied significantly in these areas over the years. This concern is well founded; notwithstanding, the Court agrees with the hearing officer's reluctant statement that correcting Robert's behavioral problems are not educational goals, and "are not really legally required due to being 'only remediative' of the underlying disability." (H.O.Op. 13.) Even though the "sameness is remarkable in [the] face of non-improvement" in Robert's behavioral goals as stated in his IEPs, the Court believes that it does not signal a lack of educational benefit. (See H.O.Op. 13)

The opinion of the hearing officer considers the inexperience of teachers and other "inappropriatenesses," such as the clashes between Robert and his full-time aide, as contributors to the "widening of the educational gap" between Robert and his chronological peers. This "widening of the gap" concept has been addressed here. The hearing officer discusses Robert's unacceptable behavior and the lack of progress in correcting it. The officer judged Robert as needing a very good Behavioral Management Plan with good implementation of the plan. This is a good, general recommendation. However, for all the reasons already stated herein, whether or not there is a "widening gap" is not the proper standard to be applied and curing Robert's disability is not a legally required educational goal.

■ The hearing officer confronts the issue of least restrictive environment in the briefest manner possible. This requirement of the Act and Texas law is not unimportant or to be taken lightly. The law cited by the hearing officer only addresses the basic proposition that the presumption in favor of mainstreaming is overcome and the school need not place a disabled child in regular education if education in a regular classroom cannot meet the unique needs of that child. *Daniel R.R. v. State Board of Education,* 874 F.2d 1036, 1045 (5th Cir.1989). Robert is not in regular education now. Only two of his classes are mainstream; the rest are either BIC or resource. The special education system includes a spectrum of environments, the least restrictive being regular classrooms, the most restrictive being residential placement. Residential placement is a viable alternative in some cases; but it is to be treated as a "last resort" when no other

environment can provide educational benefits. There must be a balance between the child's educational benefit and the restriction of his liberty. If Robert is receiving meaningful educational benefits from the IEP developed for him, the least restrictive environment in which he is receiving those benefits is appropriate. Even if the Court believed Robert was receiving no educational benefits, there are still less restrictive environments that could be tried before Robert was placed in the most restrictive.

## CONCLUSION

The Court trusts that all of the people involved in this situation are doing their best to act in Robert's interest; the efforts of the hearing officer are commendable. However, it is the Court's finding that the hearing officer erred in demanding more from EPISD than IDEA requires in regard to educational benefits. He also erred because he did not uphold the mandate that disabled children be educated with non-disabled children to the fullest extent possible, in the least restrictive environment.

The Court wishes to caution EPISD not to rest on its laurels. Many of the hearing officer's concerns are well founded.[7] Nevertheless, the hearing officer's conclusions were in error for the reasons stated. Accordingly,

IT IS ORDERED, ADJUDGED AND DECREED that the Opinion of the Hearing Officer rendered on April 19, 1994, is hereby VACATED.

IT IS ORDERED, ADJUDGED AND DECREED that Defendant Robert W. take nothing by his Counterclaim.

IT IS ORDERED that the parties shall bear their own costs.

---

7. The Court's decision today was based entirely on the record on appeal and not on any other more recent evidence of Robert's progress or lack thereof.