United States Court of Appeals,

Fifth Circuit.

No. 92-8427.

TEAGUE INDEPENDENT SCHOOL DISTRICT, Plaintiff-Appellee,

v.

TODD L., by Next Friends Mr. and Mrs. L., Defendant-Appellant.

Aug. 31, 1993.

Appeal from the United States District Court for the Western District of Texas.

Before GOLDBERG, GARWOOD, and WIENER, Circuit Judges.

GOLDBERG, Circuit Judge:

Todd L. is a bright seventeen year-old boy who has been diagnosed as suffering from various disorders of affect, behavior, learning and speech. Although Todd is quite intelligent, the special difficulties he faces contribute to a reduced ability to tolerate frustration and to adapt to external stressors. As a result of his disability, Todd is entitled to special education services under the Individuals with Disabilities Education Act ("IDEA," formerly the Education of the Handicapped Act, "EHA").[1]

As a condition of federal funding, IDEA requires states to provide all children with a "free appropriate public education," 20 U.S.C. § 1412(1), with the statutory term "appropriate" designating education from which the schoolchild obtains some degree of benefit. *See Board of Educ. v. Rowley,* 458 U.S. 176, 200, 102 S.Ct. 3034, 3047, 73 L.Ed.2d 690 (1982). IDEA requires that children with disabilities be educated to the maximum extent possible with nondisabled children in the least restrictive environment consistent with their needs,[2] a concept referred to as "mainstreaming." *See* 20 U.S.C. § 1412(5); *Rowley,* 458 U.S. at 202, 102 S.Ct. at 3049; *Sherri A.D. v. Kirby,* 975 F.2d 193, 206 (5th Cir.1992). In order to assure that all children are given a meaningful opportunity to

---

[1] 20 U.S.C. § 1400 et seq.; 34 C.F.R. § 300.5(b)(8), (9), and (10).

[2] The "least restrictive environment" denotes "not only freedom from restraint, but the freedom of the child to associate with his or her family and able-bodied peers" to the maximum extent possible. *Sherri A.D. v. Kirby,* 975 F.2d 193, 207 n. 23 (5th Cir.1992).

benefit from public education, the education of children with disabilities is required to be tailored to the unique needs of the handicapped child by means of an individualized education plan (IEP). 20 U.S.C. § 1401(a)(20).

Complying with IDEA, Todd's local public school district (the Teague Independent School District, "TISD"), in collaboration with Todd and his parents,[3] developed an IEP for Todd. Consistent with IDEA's requirement that special education services be tailored to the unique needs of the child, the IEP emphasized one-on-one instruction in specially equipped classrooms, and reduced the length of Todd's school day from seven hours to two hours. Todd's school day was reduced not for the convenience of school staff, but in response to Todd's inability to tolerate a longer school day without becoming unduly frustrated and discouraged, leading to regression rather than academic progress.[4] The school psychologist specifically found that a shortened school day would be necessary, at least temporarily, to assure that Todd's inability to tolerate frustration did not lead to his giving up on academics altogether and dropping out of school. Though Todd was educated separately from his nondisabled peers for part of the school day, the school arranged for Todd to have contact with nondisabled peers. The goal of Todd's four-year IEP was to provide him with a nonthreatening environment in which he could continue to make academic progress while gradually learning to tolerate a lengthened school day and increased stress. The record indicates that the authors of Todd's IEP fully expected that ultimately Todd would be reintegrated into "the mainstream" of regular classes at the TISD school, and would graduate.

Todd made behavioral and academic progress under his IEP.[5] In fact, Todd performed so

---

[3]The schoolchild and his or her parents are entitled to be involved in the process of developing an IEP. 20 U.S.C. § 1401(a)(20). The IEP is required to be reviewed at least annually. 20 U.S.C. § 1414(a)(5).

[4]IDEA was intended to redress a long history of discrimination by public schools against disabled children. Isolation of a schoolchild or reduction of the quality or amount of a child's educational programming solely for the convenience of staff violates IDEA. *See, e.g. Rowley,* 458 U.S. at 179, 189, 102 S.Ct. at 3037, 3042 (Congress' intent, in passing EHA, was to prohibit schools which receive federal funds from discriminating against disabled children).

[5]The evidence of Todd's progress includes the testimony of his teacher, the TISD school psychologist, and the TISD special education director. Todd's mother is also on record as having commented favorably on the progress Todd was making under his IEP.

well in a computer training project during the 1988-89 school year that he was asked to produce a brochure for the local Chamber of Commerce. To mark the occasion of the publication of the brochure, Todd's picture appeared in the local paper along with an article about his project.

Unfortunately, during a period in 1988 when Todd had not been enrolled in school at TISD, Todd's behavioral problems had brought him into contact with the juvenile justice system. On March 20, 1989, more than a year after this brush with the law, Todd was placed on probation for his earlier misconduct.

Although Todd's parents had indicated approval of Todd's academic and behavioral progress under his IEP during the 1988-89 school year, once Todd was placed on probation, Todd's parents decided that it was imperative that Todd receive more supervision. Todd's parents sought to have the school district lengthen Todd's school day or place him in a residential facility at public expense.[6] At a meeting held on March 29, 1989, TISD officials agreed to consider Todd's parents' request, but reminded Todd's parents that there was copious evidence that Todd was benefitting from the special education services he was receiving from TISD. Two days later, before the school district had had time to review the possibility of alternative placements for Todd, his parents unilaterally removed him from public school and obtained his admission to The Oaks, a highly restrictive psychiatric hospital,[7] where he remained over his own objection for fourteen months.

As promised, TISD officials toured The Oaks. On April 18, 1989, an Admission, Review and Dismissal ("ARD") meeting was held. At this ARD meeting, TISD officials discussed their findings

---

[6]Ironically, six months previously, Todd's parents had demanded that Todd be sent to a computer training school in another city, where the educational programming amounted to nothing more than a single hour of audiotaped instruction five days a week. While TISD considered the training school to be an inappropriate placement, it agreed to fund that placement. Several weeks after Todd transferred from the TISD school to the computer training school, Todd's parents asked that Todd be returned to the TISD school. The record is replete with other examples of significant alterations to Todd's educational programming made unilaterally by Todd's parents, including several admissions to psychiatric facilities. The TISD school psychologist testified that these repeated alterations to Todd's educational placement were a source of stress for Todd which might have exacerbated his behavioral problems.

[7]Under the classification system used by TISD to specify the relative restrictiveness of available placements, The Oaks' program was a "level seven" program, the most restrictive in existence.

with Todd's parents. TISD officials informed Todd's parents that they considered The Oaks a placement of last resort, and that they believed there were less restrictive alternatives (including the TISD school's special education program) from which Todd could obtain educational benefit. Nevertheless, Todd's parents decided that Todd would remain at The Oaks.

During the first two months Todd spent at The Oaks, Todd's daily educational programming was limited to two hours. Todd was confined to a locked ward, monitored twenty-four hours a day, and deprived of contact with nondisabled children. He was referred to not as a "student," but as a "patient," because the primary focus of the institution was not education but psychiatric treatment. After two months, Todd's school day was lengthened. Nevertheless, toward the end of Todd's stay at The Oaks, that facility's staff recommended that his school day again be shortened to two hours; the same length that Todd's school day had been at the TISD public school.[8]

When Todd's parents sought reimbursement for the costs of Todd's institutionalization, the TISD refused on the grounds that Todd had been able to benefit from the TISD program and that The Oaks placement was more restrictive than necessary to provide Todd with educational benefit. Todd's parents appealed to a special education hearing officer,[9] who found that Todd's parents should be reimbursed. The special education hearing officer found that Todd's parents had established that Todd's local public school was an inappropriate placement while The Oaks was an appropriate placement. According to the hearing officer, there was no evidence that Todd had obtained any benefit from special education at the TISD school. Contending that this factual conclusion was clearly erroneous, and that the hearing officer did not take into account the relative restrictiveness of The Oaks and the TISD school's special education program, the school district appealed the

---

[8]The Oaks' recommendation, like that of TISD before it, was based on the fact that Todd's learning and speech disorders, together with his emotional disability, limited his ability to tolerate the stress and frustration of a longer school day.

[9]If a parent wishes to appeal a dispute with a local public school district, the parent may obtain an "impartial due process hearing" before a special education hearing officer. 20 U.S.C. § 1415(b)(2).

hearing officer's decision to federal district court.[10]  Although the district court indicated that it gave "due weight" to the decision of the hearing officer, the district court concluded, after reviewing all the evidence from the administrative proceeding and hearing additional evidence, that the TISD public school placement was appropriate, and that The Oaks placement was inappropriate.  Therefore, the district court reversed the hearing officer's decision to grant Todd's parents reimbursement for the cost of Todd's institutionalization at The Oaks.  Todd's parents appeal the district court's decision.  We affirm.

## ANALYSIS

### I. STANDARD OF REVIEW

Todd's parents admit that the district court was statutorily entitled to hear additional evidence.  *See* 20 U.S.C. § 1415(e)(2).  However, they contend that the district court should have presumed the special education hearing officer's decision correct, and should not have engaged in an independent, *de novo* review of the evidence.  We hold that while the district court should give the hearing officer's findings "due weight,"[11] the hearing officer's findings are not conclusive and the district court may take additional evidence and reach an independent conclusion based upon the preponderance of the evidence.

IDEA provides that a district court reviewing a special education hearing officer's decision "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(e)(2).  Although the district court is directed by the statute to give the hearing officer's findings "due weight," *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051, the statute does not state that the district court must defer to those findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts.  In *Rowley,* the Court noted that:

---

[10]If either party is dissatisfied with the result of the hearing before the special education hearing officer, that party may appeal to federal district court.  20 U.S.C. § 1415(e)(2).

[11]*Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051.

Congress expressly rejected provisions that would have ... severely restricted the role of reviewing courts. In substituting the current language of the statute [20 U.S.C. § 1415(e)(2)] for language that would have made state administrative findings conclusive if supported by substantial evidence, the Conference Committee explained that courts were to make "independent decision[s] based on a preponderance of the evidence."

458 U.S. at 205, 102 S.Ct. at 3050 (quoting S.Cong.Rec. 37416 (1975) (remarks of Sen. Williams)).

In two prior opinions we have implicitly accepted the proposition that the district court will review special education administrative hearings *de novo.*[12] Today, in explicitly adopting the view that the district court's review of the hearing officer's decision is virtually *de novo,* we join the First, Seventh, Ninth and Eleventh Circuits. *See, e.g., G.D. v. Westmoreland Sch. Dist.,* 930 F.2d 942, 945-46 (1st Cir.1991); *Burlington v. Department of Educ.,* 736 F.2d 773, 791-92 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *Lachman v. Illinois State Bd. of Educ.,* 852 F.2d 290, 293 (7th Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988); *Gregory K. v. Longview Sch. Dist.,* 811 F.2d 1307, 1310-11 (9th Cir.1987); *Doe v. Alabama State Dep't of Educ.,* 915 F.2d 651, 657 (11th Cir.1990).[13]

## II. CONCLUSIONS OF FACT AND LAW

Having decided that the district court did not err in subjecting the hearing officer's decision to a searching review, it remains only to decide whether the conclusions drawn by the district court were proper. We review *de novo,* as a mixed question of law and fact, the district court's decision that the local school's IEP was appropriate and that the alternative placement was inappropriate under IDEA. *Christopher M. v. Corpus Christi Independent Sch. Dist.,* 933 F.2d 1285, 1289 (5th Cir.1991). We review the district court's findings of "underlying fact" for clear error. *Id. See also Sherri A.D.,* 975 F.2d at 207. Findings of "underlying fact" include findings that the schoolchild obtained any benefit from special education services or would be threatened by a longer school day.

---

[12]*See Christopher M. v. Corpus Christi Independent Sch. Dist.,* 933 F.2d 1285, 1289 (5th Cir.1991) ("Independent review by the district court of the appropriateness of an IEP comports with one purpose of the Act: providing procedural protections for handicapped children's rights"); *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1040 (5th Cir.1989) (presuming that district court conducts *de novo* review of the special education hearing officer's decision).

[13]We are aware of only one circuit which explicitly treats the special education hearing officer's decision as presumptively correct. *See Doyle v. Arlington County Sch. Bd.,* 953 F.2d 100 (4th Cir.1991).

*Christopher M.,* 933 F.2d at 1289.

If a parent or guardian unilaterally removes a child from the local public school system, the parent or guardian may obtain reimbursement for an alternative placement only if able to demonstrate that the regular school placement was inappropriate, and that the alternative placement was appropriate. *School Comm. of Burlington v. Department of Educ.,* 471 U.S. 359, 373-74, 105 S.Ct. 1996, 2004, 85 L.Ed.2d 385 (1985). If Todd's IEP in the local public school district was appropriate, then there is no need to inquire further as to the appropriateness of The Oaks' program.

Under IDEA, an "appropriate" placement is that which enables a child to obtain "some benefit" from the public education he is receiving; not necessarily maximization of his potential. *See Rowley,* 458 U.S. at 198-200, 102 S.Ct. at 3047. In addition to requiring that the child's placement be appropriate in the sense of providing some benefit, IDEA mandates that to the fullest extent possible, disabled children be educated with non-disabled children in the least restrictive environment. *See* 20 U.S.C. § 1412(5); *Rowley,* 458 U.S. at 202, 102 S.Ct. at 3048; *Sherri A.D.,* 975 F.2d at 206 ("Even in cases in which mainstreaming is not a feasible alternative, there is a statutory preference for serving disabled individuals in the setting which is least restrictive of their liberty and which is near the community in which their families live"). A presumption exists in favor of the local public school district's plan for educating the child, provided it comports with IDEA. *See Tatro v. State of Texas,* 703 F.2d 823, 830 (5th Cir.1983). *See generally Rowley,* 458 U.S. at 207-08, 102 S.Ct. at 3051.

There is ample evidence that Todd received significant benefit from his public school placement. Todd's teacher and school psychologist both testified that Todd made significant progress academically and behaviorally while in the TISD special education program. Not only did Todd advance in terms of grade level, he also became steadily more able to focus on particular tasks for longer periods without experiencing debilitating frustration. At the same time, the TISD special education program provided Todd with some opportunity to interact with nondisabled peers, and the opportunity to participate in the affairs of the community in which he lived.

Todd's one-on-one instruction at TISD was no more restrictive than necessary to assure that he would receive some academic benefit from special education at TISD. The school psychologist

testified that while she would have recommended some sort of residential placement had the district not been able to provide Todd with one-on-one instruction, she would never consider placing a child like Todd at a residential facility as restrictive as The Oaks without first exhausting the full range of less restrictive alternatives. She testified that even though Todd had serious behavior problems, she did not consider him so unruly as to require twenty-four hour supervision in a locked unit. In the school psychologist's opinion, The Oaks was a placement of last resort.

By contrast to the unambiguous evidence that Todd benefitted from special education at the TISD school, the evidence that Todd benefitted from educational services at The Oaks is equivocal. The evidence Todd's parents produced to support their claim that Todd benefitted academically from educational programming at The Oaks compares Todd's performance before he received special education services at the TISD school with Todd's performance after he was institutionalized. Hence, it is difficult, if not impossible, to ascertain whether the source of the benefit Todd obtained was provided primarily by the TISD school, or by The Oaks. It is uncontroverted that The Oaks' focus was on behavior management, and that The Oaks devoted only the same or a little more time to Todd's educational programming than did the TISD school.

Finally, Todd's placement at The Oaks involved more restrictions on Todd's liberty than any other potential placement, removed Todd from his home community, and completely precluded him from having any contact with nondisabled peers. There is exceedingly little evidence, other than the hospital's willingness to admit Todd, that he required such a restrictive environment.[14] Although we can assume, based on Todd's admission to The Oaks, that a physician ratified Todd's parents' decision to hospitalize their son, the great weight of the evidence indicated that he could not only cope, but thrive, in a less restrictive setting.[15]

---

[14] The fact that The Oaks agreed to admit Todd does not by itself establish that The Oaks was the least restrictive alternative. *See The Profits of Misery: Hearings Before the House Select Comm. on Children, Youth and Families,* 102 Cong., 2d Sess. (1992); Lois A. Weithorn, "Mental Hospitalization of Troublesome Youth: An Analysis of Skyrocketing Admission Rates," 40 *Stanford L.Rev.* 773 (1988).

[15] The district court found the testimony of TISD's witnesses more persuasive than that of the physicians and staff of The Oaks. In *Christopher M.,* we rejected the claim that a district court must give greater weight to the testimony of a physician than to a school psychologist or school

CONCLUSION

The evidence indicates that Todd was receiving benefit from the TISD special education program, and hence, the TISD special education program was an appropriate placement under IDEA. Equally important, the TISD special education program provided Todd with an opportunity to interact with nondisabled peers, and was a less restrictive environment than The Oaks. Thus, regardless of whether Todd extracted any academic benefit from the educational program at The Oaks, Todd's parents' unilateral decision to place him there remains their financial responsibility. For these reasons, the decision of the district court is AFFIRMED.

---

teachers. 933 F.2d at 1292 ("The hearing officer and the district court both found [the school district's] witnesses to be more persuasive, since their assessments were based upon daily and continuing observation within the classroom environment. Christopher's physician, by contrast, saw him only infrequently and for short periods of time, nor did he regularly observe the actual effects of the educational program on Christopher.... Christopher insists that his medical doctor's evaluation should be presumptively valid.... School personnel often have greater contact with a handicapped child than does a treating physician. We therefore decline to create any presumption in favor of the testimony of the child's treating physician. The district court is certainly capable of assessing the individual circumstances of each case and evaluating the credibility of both medical and nonmedical witnesses.").