**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 21, 2009

Charles R. Fulbruge III
Clerk

No. 08-10604

RICHARDSON INDEPENDENT SCHOOL DISTRICT

Plaintiff - Appellant-Cross-Appellee

v.

MICHAEL Z; CAROLYN Z, as next friends of Leah Z, a minor child

Defendants - Appellees-Cross-Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, GARZA, and PRADO, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

In this case arising under the Individuals with Disabilities Education Act ("IDEA"), Richardson Independent School District ("RISD" or the "District") appeals the district court's judgment in favor of Appellees Michael Z. and Carolyn Z. as next friends of their daughter Leah Z. Specifically, the district court determined that RISD failed to provide Leah with a free appropriate public education as required under IDEA, and that RISD was therefore required to reimburse the parents for certain costs associated with Leah's placement in a private residential facility. The district court also awarded the parents attorneys' fees and costs, granting total relief in the amount of $91,482.60. For the following reasons, we vacate and remand.

I

Leah Z., a minor child at all relevant times, was diagnosed with attention deficit disorder, oppositional defiant disorder, bipolar disorder, autism, separation anxiety disorder, and pervasive developmental disorder. After experiencing emotional and behavioral difficulties at numerous private schools, Leah entered RISD for fifth grade in the fall of 1999. Leah's various diagnoses qualified her for special education and related services from RISD. Under IDEA, RISD was obligated to provide Leah with an education tailored to her specific needs through an individualized education program ("IEP"). In Texas, the committee responsible for preparing Leah's IEP was an Admission, Review, and Dismissal Committee ("ARD Committee" or "Committee").

In seventh grade, Leah entered Westwood Junior High School where she was placed in a Behavior Adjustment ("BA") class. An ARD Committee meeting report indicates that in October 2002, during Leah's eighth-grade year, she was writing at a second- to third-grade level, reading at a third-grade level, and performing math at a sixth-grade level.[1] Leah's behavioral and academic difficulties increased in eighth grade and she experienced significant regression over the summer prior to ninth grade. When Leah began ninth grade at Westwood Junior High School, the ARD Committee met to revise her IEP.[2] Nonetheless, Leah's academic and behavioral difficulties escalated. In the fall she began leaving class without permission almost daily. Leah arrived at school

---

[1] These grade level assessments came from Leah's results on the Texas State Developed Alternative Assessment, a test designed to determine special education students' academic capabilities in relation to "mainstream" grade levels.

[2] The resultant IEP included goals of improving Leah's reading comprehension skills to a high third-grade level and her math skills to a fifth-grade level. Strategies to promote Leah's progress included using frequent reward breaks but limiting her time outside the classroom. Specifically, Leah was required to be supervised by school staff at all times and to remain in the classroom unless she had permission to leave. The IEP included remedial methods such as keeping her classroom door closed and using "physical proximity" to prevent her from exiting without permission.

late, took lengthy breaks of up to two hours at a time, and left early. In November, Leah ran away from school and was eventually caught by the school police officer. At her mother's request, she was issued a citation for leaving school grounds. On a recommendation from Leah's psychiatrist, RISD educated Leah in a "homebound" setting for four days prior to the winter break.

After winter break, Leah returned to Westwood and was placed in a different BA class. Though the transition was initially smooth, by mid-January Leah was again arriving late, leaving early, and wandering outside the classroom without permission. Numerous incidents occurred, including Leah evading school officers, overturning furniture, insulting teachers, using profane language, and disrupting testing. In evaluating the conflicting evidence of how the school reacted to Leah's frequent absences from class, the district court concluded that sometimes RISD employees supervised Leah during her absences and sometimes they did not.

In February, it was discovered that during unsupervised absences from class Leah was engaging in sexual activities with other students in the bathroom. Her psychiatrist recommended that Leah remain home until an alternative placement could be found, and RISD agreed. In March, Leah was transferred to Richardson High School ("RHS") and placed in a BA class. Since the teacher of this class was on maternity leave, RISD hired a long-term substitute, who was not certified to teach in Texas, to supervise Leah. RISD offered little assistance to the substitute. For example, she was not given Leah's IEP, and no one explained to her that Leah's major problem was fleeing from class. It appears that most of the information the substitute had about Leah came from Leah's mother. Leah remained at RHS for only two weeks, during which the pattern of disruptive behavior and refusal to work continued. Later in March, an incident occurred at home where Leah scratched her father and caused him to bleed. Her psychiatrist recommended Leah's admission to a

psychiatric facility, and Leah's parents eventually placed her at the Texas NeuroRehab Center ("TNRC"). As of April 5, 2004, Leah's parents had unilaterally removed her from RISD without notice to the District.

At TNRC, Leah attended the on-site University Charter School ("UCS"), a public charter school. UCS developed an IEP for Leah and provided her with physical therapy, occupational therapy, and counseling. Her adverse behavior continued and included numerous instances of groping staff members and other patients, attempting to remove other patients' clothing, refusing to follow directions or attend class, and engaging in self-mutilation. She was frequently physically restrained or placed in locked confinement. Leah's doctor, Dr. Mehta, considered Leah one of her most difficult patients. Dr. Mehta attributed Leah's behavioral problems to three factors: 1) Leah testing her limits in the restrictive TNRC placement; 2) the frequent changes made in her medications in an attempt to find the correct medication for her disorders; and 3) rapid and cyclical changes in her mood and behavior caused by her bipolar disorder. Dr. Mehta testified that Leah's behavior did not significantly improve until shortly after Leah started taking the medication Clozaril. The doctor attributed Leah's improvement to a combination of TNRC's structured environment, the medication, and intensive counseling and therapy sessions. Leah was discharged from TNRC on November 12, 2004, with the recommendation that she attend a special education class with one-on-one supervision to prevent future behavioral problems related to lack of supervision.

Meanwhile, in June 2004 Leah's parents requested an ARD Committee meeting to request Leah's placement at TNRC. After reviewing Leah's assessments from TNRC, the ARD Committee found that RISD remained capable of providing her with a free appropriate public education and denied the request for private residential placement. The Committee developed an updated IEP (the "June 2004 IEP") that attempted to account for Leah's sexual and

4

aggressive behavior. Leah's parents argued to the Committee that the new IEP failed to adequately account for her behavioral or academic regression. The district court found that the June 2004 IEP was substantially similar to Leah's previous IEPs.

In July 2004, Leah's parents filed a request for an administrative due process hearing alleging that RISD failed to provide Leah with a free appropriate public education and requesting reimbursement for her placement at TNRC. The Hearing Officer found in favor of the parents and awarded them $56,000. The district court agreed, and awarded the parents $54,714.40 as reimbursement for the room and board, comprehensive therapy services, nursing services, and neurological diagnostics. The district court also awarded Leah's parents $36,768.20 in attorneys' fees and costs. RISD now appeals.

## II

We review *de novo* the district court's decision that the local school's IEP was inappropriate and that the alternative placement was appropriate under IDEA, as a mixed question of law and fact. *See Teague Indep. Sch. Dist. v. Todd L.,* 999 F.2d 127, 131 (5th Cir. 1993) (citing *Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1289 (5th Cir.1991)). The district court's findings of "underlying fact" are reviewed for clear error. *Id.* Whether the child obtained any benefit from special education services is a finding of underlying fact. *Id.*

## III

This appeal involves an interpretation and application of IDEA, 20 U.S.C. §§ 1400–1487.[3] After the events in this case, Congress amended and reauthorized IDEA, *see* Individuals with Disabilities Education Improvement

---

[3] Prior versions of the Act include the Education of the Handicapped Act, Pub. L. 91-230, 84 Stat. 175 (1970) ("EHA"), and the Education for All Handicapped Children Act of 1975, Pub. L. 94-142, 89 Stat. 773 ("EAHCA").

Act of 2004, Pub. L. 108-446, 118 Stat. 2647 (codified as amended at 20 U.S.C. §§ 1400–1482), and the Department of Education revised IDEA's implementing regulations, *see* Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46540 (Aug. 14, 2006) (codified as amended at 34 C.F.R. §§ 300 & 301). For the present case, we must look to the code and regulations as they existed at the time of the events of this case. *See Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia F.*, 503 F.3d 378, 382 n.4 (5th Cir. 2007). That is, we must look to the 1997 version of IDEA (which was in effect through 2004) and its implementing regulations. *See* Individuals with Disabilities Education Act Amendments of 1997, Pub. L. 105-17, 111 Stat. 37 (codified at 20 U.S.C. §§ 1400–1487).

IDEA requires states to provide all children with a "free appropriate public education" in order to receive federal funding. 20 U.S.C. § 1412(a)(1)(A); *Forest Grove Sch. Dist. v. T.A.,* 129 S. Ct. 2484, 2487-88 (2009). To ensure that all children receive a meaningful opportunity to benefit from public education, the education of children with disabilities must be tailored to the unique needs of the handicapped child by means of an IEP. 20 U.S.C. § 1414(d). IDEA mandates that disabled children be educated among non-disabled children, to the fullest extent possible, in the least restrictive environment. *See* 20 U.S.C. § 1412(5); *Bd. of Educ. v. Rowley*, 458 U.S. 176, 202 (1982). However, IDEA does not entitle a disabled child to a program that maximizes the child's potential. *See Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997). Instead, IDEA guarantees a "basic floor" of opportunity, "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Id*. at 247-48; *see also Rowley*, 458 U.S. at 200. Still, the educational benefit "cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational

advancement." *Michael F.*, 118 F.3d at 248 (quotation marks and citation omitted).

Here, the hearing officer and district court found that RISD failed to provide Leah with a free appropriate public education. Specifically, they found that Leah's parents had shown that the June 2004 IEP was inappropriate and that Leah's placement at TNRC was appropriate. Consequently, both the hearing officer and district court determined that Leah's parents were entitled to reimbursement from the District. RISD now challenges these decisions.[4]

A

Under IDEA, when a party aggrieved by an administrative decision brings a civil action, the district court may "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). The Supreme Court has interpreted the term "appropriate" to mean "'appropriate' in light of the purpose of the Act." *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985). When parents unilaterally remove their child from a public school, reimbursement for the expenses of private schooling may be an appropriate form of relief in some situations:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the

---

[4] As an initial matter, Leah's parents ask us to clarify which party bears the burden of proof in a district court's review of an administrative decision under IDEA. At the administrative level, it is clear that the party challenging the IEP bears the burden of proof. *See Schaffer v. Weast*, 546 U.S. 49, 62 (2005). We have never distinguished the administrative level from the district court level for purposes of determining who bears the burden of proof. Rather, we have applied the same general rule that the burden of proof lies with the party challenging the IEP regardless of the stage of the proceeding. *See Michael F.*, 118 F.3d at 252 (citing *Salley v. St. Tammany Parish Sch. Bd.,* 57 F.3d 458, 462 (5th Cir. 1995); *Teague*, 999 F.2d at 131; and *Christopher M.*, 933 F.2d at 1289). Accordingly, we hold that at the district court level, as at the administrative level, the party challenging the IEP bears the burden of showing that the IEP and the resulting placement are inappropriate under IDEA.

parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(10)(C)(ii); *see also Burlington*, 471 U.S. at 369-71; *Michael F.*, 118 F.3d at 248. To receive reimbursement, a disabled child's parents must prove that (1) an IEP calling for placement in a public school was inappropriate under IDEA, and (2) the private placement was proper under the Act. *Michael F.*, 118 F.3d at 248 (citing *Burlington*, 471 U.S. at 370); *see also Florence County Sch. Dist. Four v. Shannon Carter,* 510 U.S. 7, 15 (1993). We will consider each of these issues in turn.

1

Our review of the adequacy of an IEP is limited to two questions: First, has the state complied with the procedural requirements of IDEA? *Rowley*, 458 U.S. at 206. Second, "is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id*. at 206-07. Here, Leah's parents have not challenged RISD's procedural compliance with IDEA, so our inquiry focuses only on whether the June 2004 IEP was reasonably calculated to enable Leah to receive educational benefits.[5]

In *Michael F.*, we articulated four factors relevant to the determination of whether an IEP is reasonably calculated to provide meaningful educational benefits under IDEA:

(1)     the program is individualized on the basis of the student's assessment and performance;

(2)     the program is administered in the least restrictive environment;

---

[5] The hearing officer and district court determined that the June 2004 IEP was inadequate. Though the hearing officer appears to have also addressed whether RISD provided Leah with a free appropriate public education during the 2003-2004 school year, since the district court addressed only whether Leah's June 2004 IEP was adequate, our inquiry is limited to that issue.

(3)    the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and

(4)    positive academic and non-academic benefits are demonstrated.

118 F.3d at 253. We have never specified precisely how these factors must be weighed. In practice, we have treated the *Michael F.* factors as indicators of when an IEP meets the requirements of IDEA, but we have not held that district courts are required to consider them or to weigh them in any particular way. *See, e.g., Houston Indep. Sch. Dist. v. VP,* 556 F.3d 459, 467 (5th Cir. 2009); *Adam J. v. Keller Indep. Sch. Dist.,* 328 F.3d 804, 810 (5th Cir. 2003); *Houston Indep. Sch. Dist. v. Bobby R.,* 200 F.3d 341, 347 (5th Cir. 2000).

Here, the hearing officer and district court analyzed the June 2004 IEP under the *Michael F.* framework. However, the method by which the district court weighed the factors is somewhat unclear. The district court made no express findings regarding the first factor, but did acknowledge that the IEP addressed Leah's specific behavioral difficulties and academic goals. Leah's parents did not contest the second factor, so the district court did not address whether the IEP was administered in the least restrictive environment. The third factor was briefly referenced, with the court stating that there was "reason to doubt" that Leah's IEP was implemented in a truly collaborative fashion.

The district court appeared to afford dispositive weight to the fourth factor, namely whether Leah demonstrated positive academic and non-academic benefits. No direct evidence exists of Leah's actual progress under the June 2004 IEP, since she was already at TNRC when it was created. Thus, the district court evaluated the fourth factor exclusively in terms of Leah's progress under previous IEPs, which it found were "substantially similar to [the June 2004 IEP] with several exceptions." The district court found that under the previous IEPs Leah had shown a "consistent pattern of regress," and that "the

evidence is quite sparse regarding meaningful progress either academically or non-academically for Leah during the 2003-2004 school year." Overall, the district court's conclusion that the June 2004 IEP was inadequate is based on its finding that RISD was consistently unable to resolve the primary causes of Leah's academic failure—her refusal to remain in the classroom and her destructive conduct when she was there. Though acknowledging that the IEPs contained measures to address these issues, the district court found the measures insufficient to resolve the problem because they had repeatedly failed in the past. Accordingly, the district court concluded that the June 2004 IEP failed to provide a meaningful educational benefit to Leah because it was not reasonably calculated to prevent Leah from fleeing or likely to produce different results than previous IEPs.

Though the district court might have explained why it afforded more weight to the fourth *Michael F.* factor than the others, we cannot conclude that the district court legally erred in its application of the *Michael F.* test. As explained above, we have not held that district courts must apply the four factors in any particular way. Our cases state only that these factors are "indicators" of an IEP's appropriateness, *see, e.g., VP,* 556 F.3d at 467; *Adam J.,* 328 F.3d at 810*; Bobby R.,* 200 F.3d at 347, intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit. Therefore, the district court did not legally err by affording more or less weight to particular *Michael F.* factors.

RISD argues that the district court erred by requiring it to show that Leah made actual educational progress in order to find that she was provided with a free appropriate public education. Undoubtedly, IDEA does not require a school district to maximize a disabled child's potential. *See Rowley*, 458 U.S. at 198. Rather, it requires "that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." *Id.* at 200; *see*

*also Bobby R.*, 200 F.3d at 349-50. The district court, however, did not base its ruling on a failure to maximize Leah's potential; it concluded that the June 2004 IEP was insufficient to confer any educational benefit upon Leah at all. This conclusion was not based exclusively on Leah's failure to progress. Rather, it was the stark pattern of regression over a significant period of time under similar IEPs, combined with RISD's documented inability to keep Leah in the classroom, that indicated that any IEP substantially similar to the previous ones was doomed to fail. Therefore, the district court did not commit legal error by viewing Leah's history of regression as relevant to its determination that the June 2004 IEP was insufficient to provide any educational benefit.

Moreover, the district court did not err in its factual finding that Leah received minimal educational benefits in the 2003-2004 school year. A district court's determination of whether a child received educational benefits is reviewed only for clear error. *See Bobby R.*, 200 F.3d at 347. The record supports the district court's conclusion that, absent a few isolated instances of arguable academic success, overall Leah failed to make meaningful academic progress in the 2003-2004 school year. Accordingly, we hold that the district court did not err in its finding that the June 2004 IEP calling for placement in a public school was inappropriate under IDEA.

2

The second showing that parents must make in order to receive reimbursement for the unilateral placement of their child in a private facility is that the private placement was proper under IDEA. *See Carter,* 510 U.S. at 15; *Michael F.*, 118 F.3d at 248. The district court held that TNRC was a public/private "hybrid" facility that should be assessed under the Supreme Court's framework in *Florence County School District Four v. Shannon Carter*, and adopted the Third Circuit's "inextricably intertwined" test in order to determine that Leah's placement at TNRC was proper under IDEA. RISD

argues that the district court erred by applying *Carter,* and that since Leah's placement was improper under IDEA no reimbursement is warranted. As the foregoing analysis indicates, we conclude that the district court did not err by applying *Carter,* but we vacate and remand because the district court applied the incorrect test for determining when a private placement is proper under IDEA.

a

RISD argues that the district court erred by failing to determine whether Leah's treatment at TNRC strictly complied with IDEA, instead determining that reimbursement was permitted if her treatment was "otherwise proper." *See Carter,* 510 U.S. at 15. When parents unilaterally remove their child from public school and place them in a private facility, they do so at their own financial risk. *See Burlington*, 471 U.S. at 373-74; *Carter,* 510 U.S. at 15. That is, the parents bear the risk that a hearing officer or court might later determine either that the child's existing IEP was appropriate, or that the particular facility or program into which the parents placed their child was inappropriate; in either case, a school district need not pay for the residential placement. But when a parent unilaterally withdraws their child from public school and enrolls them in a private school, the parent is entitled to reimbursement if a hearing officer or court later determines that the private school education was "otherwise proper under IDEA," even if it did not meet each specific IDEA requirement. *See Carter*, 510 U.S. at 9. In other words, parents are not barred from reimbursement because the private school did not meet the precise IDEA definition of a free appropriate public education, because IDEA requirements "cannot be read as applying to parental placements." *Id*. at 13.

Under *Carter,* then, it is clear that if TNRC were simply a private school, reimbursement would be permitted if Leah's education there was "otherwise proper" under IDEA. However, *Carter* does not directly answer the question presented here of whether a facility with both private and public components

must meet all IDEA requirements in order for the district court to allow reimbursement. Attempting to resolve this issue, the district court held that a Leah's placement at TNRC could be judged by the *Carter* standard. The district court determined that since Leah was enrolled at TNRC via unilateral parental placement after RISD failed to provide her with a free appropriate public education, *Carter*'s pronouncement that IDEA "cannot be read as applying to parental placements" allowed reimbursement if her education was "otherwise proper" under IDEA.

We agree with the district court. Though the facts in *Carter* involved a private school, the holding was not contingent on the fact that the facility was purely private. Rather, the Court was clearly focused on maintaining the right established in *Burlington*: namely, that IDEA empowers a court "'to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act.'" *Id.* at 12 (quoting *Burlington,* 471 U.S. at 369). *Carter* appreciated the situation facing a parent contemplating a unilateral withdrawal and placement after a public school proves incapable of educating their child. Such a parent faces the difficult choice of either "'go[ing] along with the [school district's] IEP to the detriment of their child if it turns out to be inappropriate or pay[ing] for what they consider to be the appropriate placement.'" *Id.* (quoting *Burlington*, 471 U.S. at 370). For parents willing to risk the latter option, Congress authorized a court to award retroactive reimbursement for a program later found to be appropriate. *Id.* at 12, 15.

However, such parents "have no way of knowing at the time they select a private school whether the school meets state [or other relevant] standards." *Carter*, 510 U.S. at 14. As the *Carter* Court noted, many IDEA requirements

require cooperation and extensive involvement by the state educational agency,[6] and "such cooperation is unlikely in cases where the school officials disagree with the need for the private placement." *Id*. at 15. Thus, the *Carter* Court required only that a parental placement be "proper" for parents to receive reimbursement. *Id*. at 12-13. In essence, *Carter* found that it would eradicate the *Burlington* right to unilateral withdrawal if reimbursement were only allowed when private facilities meet every IDEA requirement, particularly those requirements mandating state cooperation, when the entire reason for the withdrawal is the parents' dissatisfaction with the state's efforts to educate their child.

This logic extends to Leah's placement at TNRC. Leah's parents decided to remove her from public school and place her at TNRC at their own expense, after they determined that RISD was unable to provide her with a free appropriate public education. Under *Burlington* and *Carter,* they did so at their own financial risk. *Id*. at 15. Also as in *Carter,* Leah's parents received no assistance from RISD in their effort to place Leah at a private facility, and they had no way of knowing whether TNRC met each procedural requirement mandated by IDEA. We therefore should not expect that Leah's placement at TNRC would "be the exact proper placement required under the Act." *Alamo*

---

[6] Section 1401(8) defines "free appropriate public education" as special education and related services that—
(A) have been provided at public expense, under public supervision and direction, and without charge,
(B) meet the standards of the State educational agency,
(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and
(D) are provided in conformity with the individualized education program[.]

Section 1401(11) defines an IEP, and states that it must be developed, reviewed, and revised in accordance with § 1414(d). Under § 1414(d), the IEP must be developed by an "IEP Team," which must include a representative of the local educational agency. The local educational agency is required to play an integral role throughout the periodic IEP review and revision process.

*Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir. 1986).

RISD argues, however, that because UCS is a public charter school, Leah's placement should be analyzed under the normal test for any public school, i.e., the four-factor *Michael F.* test. They assert that *Carter* dealt only with parental placements at *private* schools. This argument is unconvincing. As an initial matter, RISD's argument assumes that under *Carter,* a unilateral parental placement at a *public charter school* would have to comply totally with IDEA in order for the court to allow reimbursement. Of course, *Carter* does not support this contention and would in fact never reach this question. The *Carter* rule only applies to situations where parents request reimbursement for the cost of their child's education and related services, and no such costs would accrue if a parent simply moved their child to another public school. Further, RISD argues for a rule that would require Leah's education at UCS to be evaluated separately from her treatment at TNRC (since it is clear under *Carter* that private facilities are judged under the "otherwise proper" standard). The record indicates , however, that Leah's treatment at TNRC occurred in an integrated fashion with collaboration between TNRC and UCS. As the district court noted, "an integral part of her education involved her residential placement at TNRC, over which the UCS could exercise no actual control[.]" Therefore, it would be impossible for the district court to evaluate Leah's placement under IDEA without running afoul of *Carter,* because any review of her placement would require the court to evaluate an educational plan with both public and private components. Accordingly, we hold that the district court did not err by determining that reimbursement was permitted if Leah's placement was "otherwise proper" under IDEA.[7]

---

[7] However, we note that our ruling is limited to the particular facts of this case, where it is clear that Leah was treated in a collaborative fashion at a hybrid public/private facility.

b

RISD also argues that the district court erred by determining that Leah's placement was proper under IDEA. *See Michael F.,* 118 F.3d at 248 (holding that reimbursement may be ordered only if the parents establish that the private school placement was proper under the Act). IDEA authorizes reimbursement for private residential placements in certain situations. *See T.A.,* 129 S. Ct. at 2490-91; *Burlington*, 471 U.S. at 370. A free appropriate public education includes special education and related services that have been provided at public expense. 20 U.S.C. § 1401(8)(A). "Special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and instruction in physical education." *Id.* § 1401(25). "Related services" are

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education . . . .

*Id.* § 1401(22). Department of Education regulations provide that "[i]f placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302. Thus, it is clear that, in some

---

We do not foreclose the possibility that the facts of future hybrid-type situations would indicate the appropriateness of evaluating a public education component under IDEA.

16

situations, a public school district must reimburse a disabled child's parents for the costs of a private residential program.

The Fifth Circuit has not yet articulated a test for determining when, in the face of an inappropriate IEP, a private residential placement is proper under the Act. Among circuits that have considered the issue two apparently distinct approaches have emerged, as articulated in the Third Circuit's decision in *Kruelle v. New Castle County Sch. Dist,* 642 F.2d 687 (3d Cir. 1981), and the Seventh Circuit's decision in *Dale M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307,* 237 F.3d 813, 817 (7th Cir. 2001). Though the tests adopted by each circuit contain overlapping language and arguable degrees of semantic similarity, one major characteristic separates the Third and Seventh Circuit's approaches. Specifically, the Third Circuit's test focuses on whether a child's medical, social, or emotional problems are "inextricably intertwined" with the learning process, while the Seventh Circuit's test focuses on whether the private residential placement is "primarily educational."

In *Kruelle*, the Third Circuit enunciated the following test for determining when a private residential placement is appropriate under IDEA:

> [a]nalysis must focus . . . on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process.

642 F.2d at 693. Under the Third Circuit's test, if a court cannot segregate a child's medical, social, or emotional problems from the learning process, the school district must reimburse the parents for the private residential placement.[8]

---

[8] Thereafter, each circuit to consider the issue has cited *Kruelle.* However, the degree to which each court has adopted and applied the inextricably intertwined test varies significantly. Several circuits seem to have fully adopted the test. *See, e.g., Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990); *Tenn. Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466, 1471 (6th Cir. 1996); *Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir. 1990) (per curiam); *McKenzie v. Smith,*

In *Dale M.*, the Seventh Circuit enunciated a different test for determining when private residential placement is required under IDEA:

> [t]he essential distinction is between services primarily oriented toward enabling a disabled child to obtain an education and services oriented more toward enabling the child to engage in noneducational activities. The former are 'related services' within the meaning of the statute, the latter not.

237 F.3d at 817. Accordingly, the proper inquiry in the Seventh Circuit is whether the private residential placement is "primarily educational." Though the court cited *Kruelle* favorably, the *Dale M.* test differs markedly from the *Kruelle* test in that the focus is not on whether the child's medical, social, or emotional problems are segregable from the learning process, but rather on whether the services provided at the residential facility are geared primarily toward helping the child obtain an education. Under this standard, courts have drawn a distinction between those services that are primarily for treating a child's medical or behavioral problems and those services that are primarily for enabling educational instruction. *See, e.g., id.* at 817; *People v. D.D.,* 212 Ill. 2d 410, 429-30 (Ill. 2004).

Undoubtedly, it is difficult to conceive of a disabled child, particularly a child with mental disabilities, whose medical, social, or emotional problems would have no effect on the child's ability to learn and would therefore be segregable from the learning process. Some courts applying the *Kruelle* test appear to have recognized the breadth of the "inextricably intertwined" inquiry and have attempted to limit its application. *See, e.g., Clovis*, 903 F.3d at 643 ("a

---

771 F.2d 1527, 1534 (D.C. Cir. 1985).

Another group of circuits have enunciated tests similar to *Kruelle*, but with notable semantic differences. In these circuits, the inextricably intertwined inquiry does not appear to be the primary focus. *See, e.g., Abrahamson v. Hershman*, 701 F.2d 223, 227 (1st Cir. 1983); *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997); *Ind. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769, 774 (8th Cir. 2001); *Jefferson County Bd. of Educ. v. Breen*, 853 F.2d 853, 857-58 (11th Cir. 1988).

child who must be maintained on kidney dialysis certainly cannot physically benefit from education to the extent that such services are necessary to keep him alive, but . . . it is not the responsibility of the school district to provide such maintenance care"). The *Clovis* court also denied reimbursement for psychological services. *Id.* at 645-47. However, if such services affected the child's ability to physically or psychologically receive an education, they were not segregable from the learning process and under *Kruelle*'s broad language would have been reimbursable.

Certainly, IDEA has a broad conception of education and seeks to ensure that all disabled children are provided, at public expense, with a meaningful opportunity to learn. *See* 20 U.S.C. § 1400(d)(1)(A); *T.A.,* 129 S. Ct. at 2490-91. However, IDEA does not require school districts to pay for private residential placements that are not essential for a disabled child to receive an education. *See* 34 C.F.R. § 300.302 (limiting a school district's reimbursement obligation to private school services that are "necessary . . . to provide education"). By requiring courts to undertake the Solomonic task of determining when a child's medical, social, and emotional problems are segregable from education, *Kruelle* expands school district liability beyond that required by IDEA. Put another way, it is not difficult to imagine a case where a disabled child's various difficulties may impossible for a court to segregate, but the child is still capable of receiving an educational benefit without private residential placement. *Kruelle* does not account for this situation.

Considering this, we adopt the following test:

> In order for a residential placement to be appropriate under IDEA, the placement must be  1) essential in order for the disabled child to receive a meaningful educational benefit, and 2) primarily oriented toward enabling the child to obtain an education.

Unlike *Kruelle,* this test does not make the reimbursement determination contingent on a court's ability to conduct the arguably impossible task of segregating a child's medical, social, emotional, and educational problems. The first prong of our test requires a court to find that the placement is *essential* for the child to receive a meaningful educational benefit. In other words, if a child is able to receive an educational benefit without the residential placement, even if the placement is helpful to a child's education, the school is not required to pay for it under IDEA. This formulation of the test aligns with the goal of IDEA: to enable a disabled child to receive a meaningful educational benefit. Moreover, this prong is directly tied to IDEA's implementing regulations, which state that "[i]f placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.302.

Our second prong asks the question posed in *Dale M.*: Was the residential placement primarily oriented toward enabling the child to obtain an education? IDEA, though broad in scope, does not require school districts to bear the costs of private residential services that are primarily aimed at treating a child's medical difficulties or enabling the child to participate in non-educational activities. IDEA ensures that all disabled children receive a meaningful *education*, but it was not intended to shift the costs of treating a child's disability to the public school district. This is made clear in IDEA's definition of "related services," which limit reimbursable medical services to those "for diagnostic and evaluation purposes only." 20 U.S.C. § 1401(22); *see Irving Ind. Sch. Dist. v. Tatro,* 468 U.S. 883, 892-93 (1984) (noting that the medical services exclusion was "designed to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence."); *Teague,* 999 F.2d at 132 (denying reimbursement for private residential

treatment and observing that the private facility's "focus was on behavior management" and that the private facility "devoted only the same or a little more time to Todd's educational programming than did the [public] school.").

Unlike the first prong of our test, which asks whether the private placement was appropriate in general by determining whether it was essential in order for the child to obtain a meaningful educational benefit, the second prong focuses on appropriateness at a more specific level, asking whether the particular treatments that the private facility provided were primarily oriented towards enabling the child to receive a meaningful educational benefit. As the Seventh Circuit observed in *Dale M.,* the "primarily oriented" test is another way of determining whether the child's "problems . . . are primarily educational." *See Dale M.,* 237 F.3d at 817. Thus, a court reviews the purpose of the private placement as a proxy for understanding the nature of the child's problems, along the way to determining whether the private placement was appropriate. In *Dale M.,* the court held that the child's problems were not primarily educational, as evidenced by the treatment he received at the private placement. Though the child had "the intelligence to perform well as a student" he suffered from a "lack of socialization," and the purpose of the private treatment—keeping the student out of jail—confirmed this characterization of his problems. *Id.* Similarly, here we would expect Leah's treatment at TNRC to have been primarily oriented towards educational improvement, if indeed her problems were primarily educational in nature.

The second prong of our test is necessarily a fact-intensive inquiry. A court should consider the extent to which the services provided by the residential placement fall within the IDEA's definition of "related services." This "related services" analysis should inform other factors a court may consider in determining whether the placement is primarily oriented toward enabling a child to obtain an education. Such factors include, but are not limited to:

21

whether the child was placed at the facility for educational reasons and whether the child's progress at the facility is primarily judged by educational achievement. If, upon analysis of the services as a whole, the court determines that the residential placement is primarily oriented toward enabling the child to obtain an education, the court must then examine each constituent part of the placement to weed out inappropriate treatments from the appropriate (and therefore reimburseable) ones. In other words, a finding that a particular private placement is appropriate under IDEA does not mean that all treatments received there are *per se* reimburseable; rather, reimbursement is permitted only for treatments that are related services as defined by the IDEA at 20 U.S.C. § 1401(22).

Therefore, we hold that the district court erred by adopting the *Kruelle* inextricably intertwined test. Applying our new test, it appears that the district court made the factual finding that residential placement was essential for Leah to receive a meaningful educational benefit. Specifically, the district court concluded that "Leah could achieve no academic progress short of residential placement." The record supports the district court's conclusion, and we therefore conclude that the first prong of our test has been met. However, the district court has not made any factual findings regarding the second prong, namely whether Leah's treatment at TNRC was primarily oriented toward, i.e. primarily designed for and directed to, enabling her to receive a meaningful educational benefit. Accordingly, we find that the district court erred by not considering this issue. Our remand, therefore, is limited to the question of whether the second prong of our new test has been satisfied. Specifically, on remand the district court should review the facts and determine whether Leah's treatment at TNRC was primarily oriented toward enabling her to receive a meaningful educational benefit.

B

RISD argues that even if Leah's parents are entitled to reimbursement, their failure to provide the District with adequate notice precludes any award. 20 U.S.C. § 1412(a)(10)(C)(iii) provides conditions under which a district court "may" reduce the amount of reimbursement for a private placement, including where parents do not notify the school district of their intention to reject the school district's IEP and place their child in a private facility. It is undisputed that Leah's parents did not inform RISD of their intentions when they removed Leah on April 5, 2004. Both the hearing officer and district court found that RISD had actual notice by June 2, 2004, the date on which Leah's parents contacted the District to discuss residential placement. Consequently, both the hearing officer and district court awarded reimbursement only for the costs incurred after June 2, 2004.

The District contends, however, that this post-June 2, 2004 award was erroneous, and that the failure to notify RISD prior to Leah's withdrawal should bar all recovery. This argument is without merit. Section 1412(a)(10)(C)(iii) provides that a district court "may" reduce a reimbursement award, giving the district court broad discretion to determine reimbursement. Accordingly, the district court did not abuse its discretion by awarding reimbursement despite the lack of notice.

C

Finally, RISD argues that Leah's parents are not entitled to attorneys' fees, and that the district court erred in awarding relief for services rendered prior to August 19, 2004, as well as for services rendered after August 19, 2004 that exceeded what Leah's IEP required.[9] Because we have vacated and

[9] RISD's amicus also suggests that ordering reimbursement in the present case violates the Spending Clause, as there is no clear notice in IDEA that a school district will have to pay for "primarily medical services." The Supreme Court recently dismissed a similar Spending

remanded the district court's order granting reimbursement, a determination of these issues is premature at this time.

IV

In their cross-appeal, Leah's parents argue that the district court failed to address their request for prejudgment interest. They ask us to remand for consideration of this issue. However, we conclude that the district court denied their request by not granting prejudgment interest. Since Leah's parents make no argument and cite no authority for the proposition that they could or should recover interest under IDEA, we find that they have waived this argument. *See Jason D.W.*, 158 F.3d at 212 (finding that an argument that the district court abused its discretion by failing to award interest under IDEA was waived for failure to present arguments or authority to support the position).

V

Because the district court erred in finding that the private residential placement was appropriate without considering whether the placement was primarily oriented toward enabling the child to obtain a meaningful educational

---

Clause argument in *Forest Grove Sch. Dist. v. T.A.*. There, the Court held that the fact that IDEA does not unambiguously state all conditions attached to a state's acceptance of funds does not necessarily violate the Spending Clause:

> In accepting IDEA funding, States expressly agree to provide a free appropriate public education to all children with disabilities. See § 1412(a)(1)(A). An order awarding reimbursement of private-education costs when a school district fails to provide a FAPE merely requires the district 'to belatedly pay expenses that it should have paid all along.' *Burlington,* 471 U.S. at 370-71. And States have in any event been on notice . . . that IDEA authorizes courts to order reimbursement of costs of private special-education services in appropriate circumstances.

129 S. Ct. at 2495. Moreover, IDEA requires school districts to reimburse the costs of medical, behavioral, or other related services that are necessary to enable a disabled child to receive a meaningful educational benefit. *See, e.g., Burlington*, 471 U.S. at 370; 20 U.S.C. § 1401(8), (22), (25); 34 C.F.R. § 300.302. Accordingly, this argument has no merit.

benefit, we VACATE the district court's order granting reimbursement and REMAND for proceedings consistent with this opinion.

PRADO, Circuit Judge, specially concurring.

I concur in nearly all of the court's opinion. I write separately only to note that I do not interpret our two-part test for the propriety of a residential placement as departing from that of the other circuits that have addressed this issue. As I read *Kruelle v. New Castle County School District* and its progeny,[1] our two-part test formalizes the practice of our sister circuits.

Our test first asks whether the residential placement is essential for the child to receive a meaningful educational benefit. This, to me, is the *Kruelle* standard. Though linguistically obtuse, *Kruelle* essentially asks a straightforward question: Does the child, because of her disability, require a residential placement to obtain the meaningful educational benefit to which she is entitled? By requiring that the placement be essential, our first prong asks the same question and closely tracks the better enunciations of the *Kruelle* standard.[2] As I see it, then, today's opinion joins our fellow circuits in adopting the general *Kruelle* standard.

Our test also asks whether the particular residential placement in question is primarily oriented toward enabling the child to obtain an education. This is a necessary limitation on *Kruelle*'s potentially expansive scope, as *Kruelle* asks only whether the placement is necessary. Even when a child requires a

---

[1] 642 F.2d 687 (3d Cir. 1981)*; see Abrahamson v. Hershman*, 701 F.2d 223 (1st Cir. 1983); *Mrs. B. ex rel. M.M. v. Milford Bd. of Educ.*, 103 F.3d 1114 (2d Cir. 1997); *Burke County Bd. of Educ. v. Denton ex rel. Denton*, 895 F.2d 973 (4th Cir. 1990); *Tenn. Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466 (6th Cir. 1996); *Ind. Sch. Dist. No. 284 v. A.C. ex rel. C.C.*, 258 F.3d 769 (8th Cir. 2001); *Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635 (9th Cir. 1990) (per curiam); *McKenzie v. Smith*, 771 F.2d 1527 (D.C. Cir. 1985); *see also Jefferson County Bd. of Educ. v. Breen*, 853 F.2d 853 (11th Cir. 1988).

[2] *See A.C.*, 258 F.3d at 774 ("[T]he IDEA requires that a state pay for a disabled student's residential placement if the student, because of his or her disability, cannot reasonably be anticipated to benefit from instruction without such a placement."); *Mrs. B.*, 103 F.3d at 1122 ("In deciding if a school must fund a residential placement, the court must determine whether the child requires the residential program to receive educational benefit.").

residential placement, the court must still ensure that the placement in question is proper before requiring the school district to fund it. Our test accomplishes this task by limiting reimbursement to those residential placements that are primarily oriented toward enabling the child to obtain an education, keeping in mind of course the IDEA's broad conception of education. And while not technically part of the standard itself, this limitation is one that other courts have already placed on *Kruelle*. That is, courts applying *Kruelle* have not ceased their analysis upon determining that *some* residential placement is necessary. They have instead gone on to determine whether the *particular* placement for which the parents are asking to be reimbursed is itself proper.[3] The second step of our test, then, is also consistent with the approach of other circuits.

In brief, the test we adopt today is consistent with that of our sister circuits. I therefore concur.

---

[3] *See, e.g.*, *A.C.*, 258 F.3d at 777–79 (finding that a residential placement was necessary for a child and remanding to determine whether the particular placement was appropriate); *Clovis*, 903 F.2d at 641–47 (denying reimbursement for an inappropriate placement even though both parties agreed that a residential placement of some kind was necessary).