# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 6, 2012

Lyle W. Cayce
Clerk

No.  10-20694

KLEIN INDEPENDENT SCHOOL DISTRICT,

Plaintiff - Appellant

v.

PER HOVEM; KNUT HOVEM; SIGNE HOVEM,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and STEWART and SOUTHWICK, Circuit Judges.
EDITH H. JONES, Chief Judge:

Per Hovem ("Per"), a former student of Klein Independent School District ("KISD"), along with his parents, filed a claim under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., for reimbursement of private school expenses incurred because KISD allegedly failed to provide Per with a free appropriate public education ("FAPE") while Per was a KISD student.  The special hearing officer and the district court found in favor of the Hovems.  KISD appeals. The provision of FAPE to a student qualified for special education must be judged by the overall educational benefits received, and not solely by the remediation of the student's disability.  Because this student's IEPs

No. 10-20694

enabled him to excel, with accommodations for his disability, in a mainstream high school curriculum, KISD complied procedurally and substantively with IDEA.

## I. Background

Appellee Per Hovem is a former student of KISD who suffers from several disabilities in the area of written expression. Born in Norway in 1989, Per moved with his parents to Texas just before beginning the fifth grade. From the start of his enrollment in KISD, Per demonstrated high intelligence (ultimately, a 142 IQ) and above-average performance in math and social studies. Nevertheless, Per demonstrated writing and language difficulties, along with symptoms of attention deficit disorder ("ADD"). The school's Admission, Review, and Dismissal ("ARD") committee found that Per's "writing skills were extremely limited, that his spelling and handwriting skills were very poor, and that he had difficulty in transferring information to paper." KISD determined that he was eligible for special education services, including an English resource class, as of December 3, 2001. Per and one or both parents met with various KISD teachers and experts in periodic ARD meetings throughout his public school career; all agreed, until the end, on his Individualized Education Program ("IEPs") prepared to comport with IDEA.

On October 30, 2003, KISD occupational therapist Dawn McDonald issued a report recommending that Per use a portable speller to address his spelling difficulties, a particular area of weakness for him. KISD provided the portable speller to Per for class and home use for the next five years. Beginning in the 2003-2004 school year, KISD provided Per study guides for his classes and hard copies of class notes. He was also permitted to use a computer in class for essay and written responses to assignments, while other students were required to handwrite their work. KISD made various accommodations because of Per's diagnosed difficulty in transferring information to paper by hand. He was

2

No.  10-20694

allowed to correct his spelling errors without penalty, to take extra time on written work, and to answer essay test questions orally.

On entering high school, Per began attending regular education classes, albeit with the accommodations noted above, including the ability to type written work at home.  Pursuant to his parents' request, he was placed on a trial basis in a regular English I class (with accommodations).  Per and his parents signed the ARD, which stated as Per's "Transition Plan" that he would graduate Outcome 1 (Regular Graduation) and attend college.  In January, 2005, Klein's educational diagnostician Hilda Castagnos tested Per extensively and found significant disparity between his strong achievement in reading comprehension and relative weakness in areas of written expression, pseudo-word decoding and word reading.  Not only did Per pass all his classes, however, he received a 92 in the "trial" semester of English I.

The tenth grade was again academically successful for Per.  During the fall of 2005, Per's mother solicited tutoring from Mr. Greer, an English teacher, to assist Per on the TAKS writing test scheduled in February 2006.  Per attended a couple of times but then, without explanation, stopped attending.   With accommodations, he completed his courses with above-average grades, passed all sections of the state-mandated TAKS test, including the writing test, and achieved a commended Social Studies ranking.[1]

In September 2006, Per's ARD committee met to create his IEP for the junior high school year.  The IEP listed as among Per's annual goals that he would receive a passing score in all classes and would advance one grade level, with or without the use of technology or a spelling device.  Per was to attend regular education classes but would continue to receive accommodations including extra time to complete written assignments, the opportunity to

---

[1] During fall 2005, the ADD diagnosis was removed from Per's profile.

No. 10-20694

respond orally to assignments, printed copies of class notes, and the continued use of his portable speller in class and at home. Per expressed his desire to attend NYU following graduation. Significantly, Per's parents questioned his writing skills. Ms. McDonald, an occupational therapist, was tasked to evaluate his success with assistive technology. She was aware that teachers had not seen Per using his portable speller in their classes, but Per assured her that he could use it. Indeed, he was given and used a portable French speller in his second-year French class. (Later, in the administrative hearing, Per confirmed that he felt uncomfortable using the portable speller in mainstream classes and that it sometimes took a frustratingly long time to use.) Ms. McDonald concluded her evaluation recommending continued use of the portable speller and classroom computers.

Per continued to earn above-average grades in his junior year in the following classes: English, Algebra 2, Chemistry, United States History, French 2, Theater Production, and Art. He was expected to pass the TAKS test administered at the end of the year, and he achieved Commended scores in Social Studies and Science, but he failed the written composition sections, which comprised a portion of the exit level English test.

Responding to this singular failure, the school placed Per in a practical writing course during his senior year. Conducted by Mr. Greer, an experienced teacher, this small class was designed for students who failed the written portion of the ELA TAKS test. The class met daily and systematically covered basic writing skills. Per never attended the additional tutoring Greer offered. At the administrative hearing, however, Per testified that Greer's approach most closely resembled his later remedial instruction at Landmark School and, as such, was helpful to him. Mr. Greer testified in the hearing that by spring 2008, he thought Per had developed skills sufficient to enable his passing the writing portions of the TAKS test, with the use of a computer.

No. 10-20694

The ARD committee, meeting in mid-September, had planned Per's program for his senior year. At that time, with the acquiescence of Per and his parents, his accommodations were reduced to the use of a computer for writing assignments and the portable speller. He would remain in mainstream classes, including Mr. Greer's practical writing course, and would receive "special education monitoring" of only 30 minutes per semester. No change was made concerning his college-bound intentions. Reinforcing the expectations for Per, two of his SAT scores in October testing were very high: 650 (89th percentile nationally) in Critical Reading and 640 (84th national percentile) in Math. His SAT Writing score, however, was a lowly 340 (6th percentile nationally).

Per and his parents soon became convinced he was incapable, by virtue of his disability in written expression, of performing college-level work. His mother observed him struggle for hours and days while attempting to fill out college application forms and essays. His writing, she said, was so poor that he could not take phone messages at home. He failed both the October and spring re-takes of the ELA TAKS writing test.[2] The family had him re-evaluated and began looking into Landmark School in Boston, which specializes in teaching intelligent disabled students with methods designed to ameliorate their deficiencies in writing, spelling, and phonetics.

Not until March 2008 did a Klein English teacher, although familiar with Per's accommodations, recognize the extent of Per's difficulty in writing as she watched him make up an in-class essay assignment for her. Previously, Ms. Marek testified, his major papers had been turned in after being typed at home (like those of other students) and were at least as good as those of his

---

[2] When asked at the hearing why he left the spring test well before the allotted time had run, Per explained that he thought he had done well enough to pass. He also explained candidly that what he thought was sufficient writing and proofreading could be "totally non-cohesive and non-anything" to an observer unfamiliar with his writing and style.

5

No. 10-20694

peers. His written classwork was acceptable. His ability to read out loud, she said, was fine. Per never availed himself of graphic organizing materials she furnished the students to assist, *inter alia*, in framing their college essays, nor did he attend any of her regularly scheduled tutoring sessions.

In order to delay his graduation and preserve his eligibility for Landmark School, which would not accept high school graduates, Per dropped an economics class required for graduation from Klein. Beginning in May, a series of ARD committee meetings occurred in which the Hovems contended that Per had not received a FAPE from Klein, while the Klein participants urged Per to finish the economics class during the summer and graduate--with a waiver of the ELA TAKS test if necessary.[3] Per instead enrolled in Landmark's summer school program, followed by at least one additional full school year there.

Because Klein refused to reimburse the Hovems for the costs of attending Landmark, they pursued an administrative due process hearing. The hearing officer held, in essence, that Per's IEPs had been insufficiently tailored to his unique needs because they failed to contain sufficient transitional planning for his entry into college and failed to address his learning disability. The hearing officer concluded Per had not received a FAPE, *i.e.*, an educational benefit, because of these IEP procedural deficiencies. Finding the Landmark School an appropriate placement, he ordered the district to reimburse the family for more than two years' attendance costs.

The district court affirmed the conclusion of the special hearing officer that KISD failed to provide Per with a FAPE and that the Hovems were entitled to reimbursement for the tuition costs, but not residential costs, of the Landmark School. KISD here appeals the decision of the district court.

---

[3] Under Texas law, when Per reached 18 in November 2007, he became his own decisionmaker for IDEA purposes.

No.  10-20694

## II.  Standard of Review

In cases such as this, "although the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence."  *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997) (citations omitted) (hereafter, *"Michael F."*).  Thus, the district court's review of the special hearing officer's recommendation is "virtually *de novo.*"  *Id.*[4]

This court reviews *de novo*, as a mixed question of law and fact, the district court's decision that a school district failed to provide a FAPE under IDEA. *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993).  The district court's findings of "underlying fact" are reviewed for clear error.  *Id.* "The clear error standard of review 'precludes reversal of a district court's [factual] findings unless [the appellate court is] left with a definite and firm conviction that a mistake has been committed.'" *Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009) (quoting *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006) (internal quotation marks and citations omitted)).  Whether the student obtained educational benefits from the school's special education services is a finding of underlying fact.  *Teague*, 999 F.2d at 131.  A party attacking the district's IEP bears the burden of demonstrating its non-compliance with IDEA.  *Id.*

---

[4] The district court's opinion in this case erroneously recited "clear error" as its standard of review when discussing the hearing officer's decision.  However, this citation follows nearly two pages of discussion correctly articulating the virtually *de novo* review required of district courts.  And following the standards discussion are a 28-page description of the factual record, a 50-page summary of the parties' legal and factual briefing and 16 pages of the court's substantive analysis.  In context, we attribute no adverse consequence from the passing error.

## III. Discussion

The central issue raised by KISD is whether Per Hovem received a FAPE consistent with IDEA.

IDEA requires the development of an individualized education program ("IEP") for each child falling within the purview of IDEA. IEPs are created and periodically reviewed following meetings at which parents, teachers, other school personnel, and educational experts all participate. 20 U.S.C. § 1414(d)(1)(B). The IEP includes a statement of the special education, related services and accommodations the school will provide to the child. 20 U.S.C. § 1414(d)(1)(A). Once school officials and parents agree on the IEP, the school district must put it into effect. 20 U.S.C. § 1414(d)(2)(A). The IDEA requires that school districts allow parents to play a significant role in the development of IEPs for each child with a disability. *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524, 127 S. Ct. 1994 (2007).

IDEA also requires states to establish procedures to resolve IEP-related disputes between parents and school districts. 20 U.S.C. §§ 1414, 1415. A state must provide parents an opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). If such a complaint cannot be resolved to the parents' satisfaction, they may proceed to an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A). The hearing generally is limited to the identification, evaluation, or educational placement of the child, or to determining whether the child received a FAPE. 20 U.S.C. § 1415(f)(3)(E)(I).

After parents have exhausted the available administrative procedures, any involved party aggrieved by the final decision of the state education agency that conducted the hearing may "bring a civil action with respect to the complaint presented pursuant to this section" in state or federal court. 20 U.S.C.

No. 10-20694

§ 1415(i)(2)(A). While the court must receive the record of the administrative proceeding and give it "due weight," it must also hear any additional evidence the parties present. 20 U.S.C. § 1415(i)(2)(C); *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034 (1982). IDEA authorizes the court then to issue "appropriate" relief. 20 U.S.C. § 1415(i)(2)(C).

Parents who remove their child from a public school setting because they believe that the public education program fails to provide a FAPE and who place their child in a private school for that reason are entitled to reimbursement if the court holds that the proposed IEP did not provide a FAPE and the private school placement was "appropriate." *School Comm. of Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 369 (1985); *see also*, 34 C.F.R. 300.148(c); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 129 S. Ct. 2484, 2496 (2009).

IDEA guarantees only a "basic floor" of opportunity, "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Rowley*, 458 U.S. at 188-89, 102 S. Ct. at 3042; *see also Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009) (citations omitted). An IEP need not be the best possible one, nor does it entitle a disabled child to a program that maximizes the child's potential. *Michael F.*, 118 F.3d at 247-48. Nevertheless, a school district must provide the student with a meaningful educational benefit. See *Juan P.*, 582 F.3d at 583 (citing *Michael F.*, 118 F.3d at 248 (5th Cir. 1997) (citations omitted)).

This court's *de novo* review of the adequacy of an IEP is limited to two basic questions: (1) Did the school district comply with the procedural requirements of the IDEA?; and (2) Is the IEP reasonably calculated to enable the student to receive educational benefits? *Rowley*, 458 U.S. 176, 206–7, 102 S. Ct. at 3051 (1982). With respect to the first inquiry, "procedural defects alone do not constitute a violation of the right to a FAPE unless they result in

the loss of an educational opportunity[.]" *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003) (quoting *T.S. v. Indep. Sch. Dist. No. 54*, 265 F.3d 1090, 1095 (10th Cir. 2001)). Four factors guide the court's analysis of the second inquiry. The court evaluates whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Michael F.*, 118 F.3d at 253. This Court, however, has "not held that district courts are required to consider them or to weigh them in any particular way." *Michael Z.*, 580 F.3d at 293.

KISD contends that it met its statutory obligation to provide Per Hovem with a FAPE, as evidenced in part by his better-than-average grades in mainstream general education classes and his continuous, timely progress toward high school graduation. KISD underscores that mainstreaming disabled students into the curriculum with non-disabled students is among the express objectives of the IDEA. 20 U.S.C. § 1412(a)(5)(A). KISD further contends that KISD's mainstream educational program, coupled with Per's special accommodations described above, were not required to completely remediate Per's disability in order to prepare him for post-graduation employment or education.

The Hovems insist that KISD failed to provide Per with a FAPE. They argue that KISD cannot rely on Per's academic success in areas allegedly not affected by his disability in order to justify KISD's claim to have provided a FAPE. Rather, they assert that his IEPs were not sufficiently individualized,

the collaborative process was thwarted, and KISD afford no "academic benefit" tailored to his disability.[5]

The district court relied upon the second *Rowley* prong in determining that KISD failed to provide a FAPE to Per. Considering the four *Michael F.* factors, the court determined that only the second factor, that the program be administered in the least restrictive environment, partially supported KISD's position that Per's IEP was reasonably calculated to provide him with meaningful educational benefit.

Unfortunately, the court's reasoning is flawed by its legal error in interpreting the "educational benefit" afforded Per solely in terms of weaknesses caused by his learning disability rather than his overall academic record at Klein. Factual findings made under an erroneous view of controlling legal principles are reviewed *de novo*. *Flint Hills Resources LP v. Jag Energy, Inc.*, 559 F.3d 373, 375 (5th Cir. 2009) (quoting *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 359 F.3d 777, 779 (5th Cir. 2004). In *Rowley*, the Supreme Court clearly and repeatedly expressed IDEA's purpose "to confer some <u>educational</u> <u>benefit</u> upon the handicapped child." 458 U.S. at 200, 102 S. Ct. at 3048 (emphasis added). The Court quoted the statute as affording "specially designed instruction" and services "to assist a handicapped child <u>to</u> <u>benefit</u> from special education. § 1401(17) (emphasis added)." *Id.* *Rowley* declined to fix any single test to determine the adequacy of benefits that must be conferred by IDEA; this court's *Michael F.* test fills in some gaps. But *Rowley* held that for a particular child who had received "substantial" specialized instruction and services to compensate for deafness and "who is performing above average in the regular classrooms of a public school system," the IEP was sufficient to afford

---

[5] The Hovems also challenge various aspects of the IDEA procedures followed by KISD, but these claims were rejected or subsumed in the district court's findings that he did not receive a FAPE.

No. 10-20694

her a FAPE. The Court held, "the IEP, and therefore the personalized instruction, should . . . if the child is being educated in the regular classrooms . . . be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." 458 U.S. at 204, 102 S. Ct. at 3049. *Rowley* not only enjoined lower courts to be "careful to avoid imposing their view of preferable educational methods . . ." 458 U.S. at 207, 102 S. Ct. at 3051, but on the facts before it rejected a demand that the particular student be furnished additional auditory services to maximize her potential. 458 U.S. at 198, 102 S. Ct. at 3047.

Nowhere in *Rowley* is the educational benefit defined exclusively or even primarily in terms of correcting the child's disability. Certainly, given the wide range of disabilities covered by IDEA, remediation may often be part of an IEP. Behavioral modifications, for instance, immediately come to mind as an example of an IEP strategy that may remediate a disability while also being necessary to confer educational benefits. But the whole educational experience, and its adaptation to confer "benefits" on the child, is the ultimate statutory goal.

From this holistic perspective, we have carefully reviewed Per's IEPs, his high school educational record, his assessments and the administrative hearing record. Our application of each of the *Michael F.* factors thus necessarily differs from those of the district court and hearing officer.

First, KISD customized Per's educational program "on the basis of the student's assessment and performance." *Michael F.*, 118 F.3d at 253. The district court overlooked the series of accommodations, listed above, that were accorded Per in all of his classes. While criticizing KISD for not addressing Per's failure to use the portable speller, the court also overlooks that Per chose not to use it and misinformed the therapist about his intentions. The district court suggests, on one hand, that Per was not held to the same academic standards as other students in general education classes, while on the other hand, the court

12

states that Per was a successful student in spite of, not because of, his IEPs. Aside from the internal inconsistency of these findings, there is no record evidence that Per was assigned a lighter workload: he was instead allowed to prove his mastery of subjects in a different way, using accommodations. The accommodations were tailored to allowing him to undertake regular education classes for which he was obviously well suited apart from his disability.

The fundamental issue as seen by the district court is whether Per's program, fully acquiesced in by his parents until his senior high school year, was not sufficiently individualized because it failed to enable him to write and spell better. On the facts before us, *Rowley* is decisive. As has been noted, overall educational benefit, not solely disability remediation, is IDEA's statutory goal. Per's IEPs were sufficient because they were "reasonably calculated to enable [Per] to achieve passing marks and advance from grade to grade" in mainstream classes. *Rowley*, 458 U.S. at 204, 102 S. Ct. at 3049. Moreover, an IEP is not required to maximize a child's potential, but to provide "a basic floor of opportunity." *See Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 346 (5th Cir. 2000) (paraphrasing *Rowley*). Finally, *Rowley* emphasizes that courts should not lightly disregard educators' decisions on the appropriate educational methods to achieve a FAPE. Whether KISD could have remediated Per's disability more effectively is debatable, but the school district did far more, and offered him far more, than robotic IDEA form-checking to assist his performance in school. And, to say nothing of his generally admirable academic career, the record shows that he made progress in his written expression over the course of high school. His IEPs were sufficiently individualized.

The district court and hearing officer also held the IEPs insufficient because Per's Transition Plan was "not individualized by any objective, measurable goals" to meet his needs after high school. IDEA requires preparation of Transition Plans covering a child's post-secondary goals and

services. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII). Under these circumstances, any insufficiency was a procedural violation of IDEA. *See Bd. of Educ. v. Ross*, 486 F.3d 267, 276 (7th Cir. 2007). "Procedural deficiencies alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity" or "infringe [] parents' opportunity to participate in the IEP process." *Adam J.*, *supra*, 328 F.3d at 812. Per's Transition Plans consistently called for him to graduate Outcome 1 (Regular Graduation). His family failed to avail themselves of KISD's college application assistance resources when they decided Per was not ready to attend college. The Transition Plans alone did not cause him to "lose an educational opportunity" for college education that the school was required to provide.

Second, there is no real dispute that, because he was enrolled in mainstream classes, Per was furnished specialized educational services in the least restrictive environment. *Michael F.*, 118 F.3d at 253; *see also* 20 U.S.C. § 1412(a)(5)(A) (requiring mainstreaming to maximum feasible extent).

Third, Per's services were provided in a collaborative and coordinated manner by the key "stakeholders." *Michael F.*, 118 F.3d at 253. The district court's contrary holding, and the Hovems' argument on appeal, centers on the parents' having been "misled" about the extent of Per's expressive difficulties until he was re-tested in his senior year of high school. Because, they contend, the Hovems were misled about his poor performance in writing and spelling and were lulled into complacency by reports of Per's intelligence and equable nature, they could not effectively participate in the collaborative process. There is no suggestion that appropriate KISD participants failed to attend ARD meetings, falsified information, or failed to "coordinate" Per's services or accommodations while he attended school there. Thus, there was no failure of collaboration absent the factual premise that the Hovems were misled. But we must reject that premise. The positive facts that Per was well-liked by his teachers and was

No. 10-20694

regarded as a talented student were in no way misleading, though they may have afforded false comfort regarding his deficiencies. Nevertheless, testing performed in 2005 revealed his deep disorder of written expression co-existing with otherwise superior abilities.[6] Per apparently relied on family members to type papers at home, and his mother knew he would not write phone messages. At some level there may been failures to communicate or of mutual understanding, but the record affords no basis for concluding that KISD misled the Hovems so as to undermine the goal of collaboration for Per's benefit.

Fourth, and most significant, *Michael F.* inquires whether positive academic and non-academic benefits accrued to the student. 118 F.3d at 253. This court has stated, "clearly," evidence of an academic benefit militates in favor of a finding that an IEP is appropriate. *Adam J. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 810 (5th Cir. 2003). *See also Juan P.* 582 F.3d 576, 588 (5th Cir. 2009) ("educational benefit" one of the most critical factors in assessing an IEP). Viewed from the holistic *Rowley* perspective, rather than the district court's narrow perspective of disability remediation, Per obtained a high school level education that would have been sufficient for graduation. (Indeed, Per is in college now.) As *Rowley* notes, when a learning disabled student "is being educated in the regular classrooms of the public education system, [an IEP] should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." 458 U.S. at 204, 102 S. Ct. at 3049. This is because grading and advancement in regular classrooms monitor a child's

---

[6] Further testing in 2008 dramatized Per's problems by affixing grade level competence estimates in certain areas like "word attack." KISD challenges grade-level assessments as educationally dubious, and certain of Per's results seem at odds with his demonstrated talents. Rather than attempt to resolve a debate better suited for specialists, we simply note the similarity between the general areas of weakness found in both 2005 and 2008, in testing administered, respectively, by Klein and the parents' experts. Per's disorder of written expression included his omitting words when writing and difficulties in spelling, legibility, and transferring thoughts to paper.

No.  10-20694

progress, and the "system itself" confirms the extent of educational benefit to the child.  458 U.S. at 203, 102 S. Ct. at 3049.  This is not a case where Per regressed educationally or could not measure up to ordinary grade-level standards. *Compare Juan P.*, *supra*, 586 F.3d at 588-90 (IEP insufficient because student would not have advanced without lowered standards), with *Bobby R.*, *supra*, 200 F.3d at 350 (advancement is not required in *every* area to obtain an educational benefit from an IEP).

In sum, each of the *Michael F.* factors, analyzed under the correct legal standard, supports the conclusion that Per's IEPs were adequate to confer a FAPE.  It is regrettable that the sources of Per's disability of written expression, having been early exposed, were not attacked earlier in his educational career. The school district, however, did not fail to comply with IDEA when the means it used facilitated Per's substantial achievements in secondary school.  *Rowley* requires no more.

## Conclusion

For these reasons, the judgment of the district court is **REVERSED** and **RENDERED**.

No. 10-20694

CARL E. STEWART, Circuit Judge, dissenting.

As the majority notes, Defendant-Appellee Per Hovem is an intelligent former student of Plaintiff-Appellant Klein Independent School District (KISD). Though Per was a gifted student in other areas, he suffered from a special learning disability in the area of written expression, which is covered by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. When Per's parents, Defendants-Appellees Knut and Signe Hovem, realized that he was not improving in his area of disability, they removed him from KISD and enrolled him in the Landmark School, which specializes in language-based learning disabilities. Per's parents subsequently filed an administrative complaint, seeking reimbursement for Per's educational expenses at the Landmark School. Both the Texas Education Agency special education hearing officer assigned to the case and the district court, upon review of the extensive administrative record, concluded that KISD had failed to provide Per a free appropriate public education (FAPE) as required by the IDEA. Contrarily, the majority concludes that KISD satisfied its obligations under the IDEA by mainstreaming Per into the regular education classroom setting, where he achieved passing marks. As the majority improperly displaces our deferential review of a district court's factual determinations rendered in the IDEA context, and as the majority's holding can be interpreted to permit federally-funded school districts to circumvent the purposes of the IDEA by socially-promoting disabled students in mainstream curricula without addressing the individualized special needs of their respective disabilities, I respectfully dissent.

## I.

We review de novo, as a mixed question of law and fact, the district court's decision that a school district failed to provide a FAPE under the IDEA;

however, the district court's findings of "underlying fact" are reviewed for clear error. *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993). Whether the student obtained educational benefits from special education services is a finding of underlying fact. *Id.* at 131. "The clear error standard of review 'precludes reversal of a district court's [factual] findings unless [the court is] left with a definite and firm conviction that a mistake has been committed.'" *Hous. Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 583 (5th Cir. 2009) (quoting *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006) (internal quotation marks and citations omitted)).

The IDEA guarantees a "basic floor" of opportunity, "*specifically designed to meet the child's unique needs*, supported by services that will permit him to benefit from the instruction." *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009) (citations omitted) (emphasis added). "IDEA does not entitle a disabled child to a program that maximizes the child's potential." *Id.* "'Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be *likely to produce progress*, not regression or trivial educational advancement.'" *Juan P.*, 582 F.3d at 583 (citing *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997)) (emphasis added). A school district must provide the student with "meaningful" educational benefit. *Id.*

The IDEA requires that school districts develop an IEP for each child with a disability, and parents play a significant role in the process. *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524 (2007). The IEP is required to include a statement of the child's present levels of academic achievement, to include "how the child's disability affects the child's involvement and progress in the general education curriculum[,]" as well as a statement of measurable annual goals designed to "meet the child's needs that result from the

No. 10-20694

child's disability to enable the child to be involved in and make progress in the general education curriculum[.]" 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa)-(II)(aa).

## II.

We have set out four factors to guide our analysis of whether an IEP is reasonably calculated to provide meaningful educational benefit to a disabled student: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Michael F.*, 118 F.3d at 253. "[W]e have not held that district courts are required to consider them or to weigh them in any particular way." *Michael Z.*, 580 F.3d at 293.

Applying these factors, the district court concluded that the first, third, and fourth factors favored the Hovems, and only the second factor partially supported KISD's position. Specifically, the district court found that, after years of being assured that Per was making progress in the area of his disability because he was passing his regular education classes, the Hovems independently sought extensive testing and discovered that Per was functioning significantly below grade level in his area of disability, which prompted them to remove him from KISD and enroll him in the Landmark School.

The district court further found that Per's IEPs were unchanged for three years of high school, and were not reasonably calculated to enable him to receive educational benefit. The shortcomings of Per's IEP are evident. Per's meager annual goals- to achieve passing marks and advance to the next grade level- were not individualized because these are the goals for all students. Additionally, for special services, Per was assigned a computer and portable speller, which KISD employees, though aware the tools were not being used, made no effort to ensure that he use. KISD likewise failed to research or

No.  10-20694

identify alternative devices to assist Per.  Under this program of instruction, Per scored 650 in reading and 640 in math on his SAT, yet only 320 on the writing portion of the test.   He failed the written portion of the Texas Assessment of Knowledge and Skills (TAKS) in three attempts during his final two years in public high school.

Moreover, although Per was mainstreamed into the regular education setting, the district court found that he was not held to the same standards as his non-disabled classmates.  Rather, he was routinely excused from turning in homework and permitted to answer questions orally when teachers could not decipher his written work.  It is undisputed that, in order to enable Per to graduate from public high school, KISD waived passage of the written TAKS as a requirement for graduation.

The underlying facts, as set forth by the district court in a painstakingly-detailed 124-page written decision, clearly demonstrate to me that KISD failed to address Per's learning disability in an individualized fashion, as is required by the IDEA.  Instead, KISD swept Per's deficits under the proverbial rug, placing him in the regular education curriculum and setting only generalized educational goals in his repetitive IEPs, making exceptions to enable him to pass his mainstream classes while ignoring that the tools meant to assist him went effectively unused for years, all the while applauding Per's good grades to his parents as evidence of his progress.

Confronted with these facts, the majority curiously reasons that the district court's factual determinations are not entitled to clear error review, and instead are subject to de novo review, because the district court had "an erroneous view of controlling legal principles."  This, in spite of the district court's accurate references to the appropriate legal standards governing this case, including *Board of Education v. Rowley*, 458 U.S. 176 (1982).  Given the district court's exhaustive recitation of the law at issue here, as well as the

No. 10-20694

district court's lengthy explanation of the reasons for its decision, I am convinced that the district court was well aware of the substantive legal standards implicated by the IDEA and engaged in an appropriately rigorous review of the hearing officer's determination. Moreover, my reading of the record satisfies me that the district court not only recited the correct legal standards, it faithfully adhered to them as well.

Furthermore, the majority has failed to satisfactorily explain how the district court's purported "erroneous view" of the law misled it in determining the numerous underlying facts, such as the fact the Per's IEP was unchanged for three years, the fact that Per's teachers excepted him from written work, the fact that KISD waived passage of the written TAKS as a graduation requirement, and the fact that KISD officials were aware that he did not use his assistive devices yet did nothing. In my view, the majority's analysis is fueled by an unwarranted usurpation of the role of fact-finder, appropriately reserved to the hearing officer and district court.

## III.

Applying our appropriately deferential standard of review to the district court's factual conclusions, including the district court's factual finding that Per did not obtain educational benefits from the meager special education services afforded him by KISD, the judgment of the district court and hearing officer should be affirmed. However, even assuming arguendo the correctness of the majority's contention that de novo review should apply to the district court's factual findings, there is abundant persuasive evidence in the record establishing that Per's academic program was not tailored in order to produce meaningful educational benefit, that Per's academic program was not individualized according to his distinct needs, and that KISD failed to devote significant and serious effort to collaborate with Per and his parents in the development of his academic plan.

No.  10-20694

The administrative record consists of hundreds of pages, and includes Per's IEPs and the transcript of the administrative due process hearing.  Over the course of three days in December 2008, Per and his family put on eleven witnesses, including two expert witnesses, and KISD put on five witnesses.  The following month, the Texas Education Agency special education hearing officer, after considering all of the evidence presented, rendered a twenty-four page decision in Per's favor.  Specifically, the hearing officer determined that KISD denied Per a FAPE because his program of instruction was not developed to address his individualized educational needs.

The record itself is replete with acknowledgments, many from KISD's own employees, of KISD's failure to adequately and appropriately respond to the particularized nature of Per's writing deficit.  Instead, Per was thrust into the general curriculum and consistently promoted, all the while his weaknesses were effectively ignored.

For instance, Dr. Mary Rosenberg, KISD's executive director of student support services, testified at Per's due process hearing that although school officials were aware that Per had deficits in written expression, reading, spelling, and homework completion, there were no goals and objectives set forth in his IEPs to address these problems.  Dr. Rosenberg admitted that KISD's sole criterion for determining whether to formulate annual goals, objectives, and services to address a student's deficit is whether the problem impaired the student's ability to progress in the regular curriculum.  Accordingly, so long as Per continued to receive passing marks, KISD, pursuant to its narrow interpretation of its responsibilities under the IDEA, would not implement goals, objectives, or services to respond to his significant educational deficits, of which KISD had long been aware.  Dr. Rosenberg further admitted that Per's IEP's did not include goals and objectives related to transition planning, and that his

22

No. 10-20694

stated goals, to achieve passing grades and progress through the general curriculum, went unchanged from 2006 through 2008.

Mr. Greer, an English teacher at Per's former high school, testified that 95 percent of students at the school pass the written portion of the TAKS. When Per's mother became concerned about Per's lack of progress in his area of disability during tenth grade, she reached out to Per's counselors, who in turn referred her to Mr. Greer, who admittedly was not specially trained to respond to Per's unusual deficits. Mr. Greer further testified that school officials did not give him specific details regarding Per's learning problems.

Mr. Greer soon realized that Per would require significant help to prepare him for the TAKS. While it took an average tenth grader less than a minute to write a sentence, it took Per ten to fifteen minutes. It could also take Per three or four days to write a paragraph. Yet, no one associated with KISD suggested that Per have regularly scheduled sessions with Mr. Greer, who would have been willing to participate as his schedule permitted. Mr. Greer testified that he ultimately had three or four tutoring sessions with Per, which did not even attempt to address Per's spelling difficulties.

After failing the written TAKS in eleventh grade, Per was assigned to Mr. Greer's writing skills class, which was assigned to all students who failed the written TAKS, in twelfth grade. Mr. Greer testified that Per would "labor" over his work, a contrast to the majority's description of him, which suggests that Per was simply unwilling to improve his performance. Mr. Greer was aware of only one academic goal for Per: that he pass the TAKS test. Mr. Greer testified that he believed Per was a regular education student with accommodations, rather than a special needs student. Mr. Greer testified that Per rarely used his portable speller and preferred to look words up in the dictionary himself. As expressed above, in spite of being a student in Mr. Greer's writing skills class, Per failed the written TAKS twice more during his senior year.

Ms. Marek, Per's senior year English teacher, also testified at his due process hearing. She admitted that she was not a special education teacher, and had received no training to address Per's learning disabilities in the two years prior to the hearing. She recalled an occasion during the spring of Per's senior year when he demonstrated significant difficulty in completing an in-class essay assignment, putting his hand on his forehead. Following this incident, Ms. Marek took it upon herself to notify Per's parents and suggest assistive technology. As a result of her efforts, Per was given the Kurzweil computer program for use in his writing assignments. The program allowed Per to complete work more swiftly; however, even with the assistance of the program, it took Per forty minutes to complete a short essay while it took an average student only ten minutes.

Dawn McDonald, an occupational therapist for KISD, also testified at the due process hearing. Ms. McDonald admitted that she became aware in tenth or eleventh grade that Per did not use his portable speller, but believed that there was nothing that she could do about it. Even after she received reports from teachers that Per did not use his speller, she did not address those reports with him. When asked whether she would describe Per's failure to use the portable speller in class as a refusal of help, Ms. McDonald answered that Per is "the most respectful young man I have ever met in my life" and that she "would never say he would refuse me." She conceded that when a student's behavior interferes with his learning, the school is obligated to assess the student's behavior. However, she admitted, Per's failure to use his speller was never assessed.

Ms. McDonald testified that she did not recommend any software programs as alternative assistive technology until the spring of his senior year, after Ms. Marek's urging. More troubling is Ms. McDonald's admission that she never believed that Per's portable speller was the best device to assist him, as

she "felt . . . the best device for Per had auditory feedback." Yet, because Per preferred to use the speller without auditory feedback, that is the one she assigned to him. Ms. McDonald admitted that from the fall of 2003 through the fall of 2008, she never brought up the subject of using an auditory feedback speller to Per or his parents.

In January of 2005, Per's mother requested that he be evaluated for dysgraphia, a writing disorder. Ms. McDonald admitted that it would have been her job to perform such an evaluation. However, as the matter was not properly referred to her, a dysgraphia evaluation was never performed.

Ms. McDonald acknowledged that she dismissed Per from her occupational therapy services in September of his senior year, even though she was aware by his junior year that Per's speller was not being used and even though Per had already once failed the written TAKS. Ms. McDonald admitted during her examination that Per's annual goals, as set forth in his IEPs, failed to provide measurable objectives to enable Per to achieve academically. She also admitted that the "measurable educational outcomes" section of one of Per's occupational therapy evaluations improperly included goals, such as copying assignments from the board and producing legible work, that were not in fact measurable.

Hilda Castagnos, an educational diagnostician for KISD, testified that even though her evaluation report indicated that Per had "severe discrepancies between achievement and intellectual ability in the areas of reading comprehension, basic reading skills, and written expression" which were "consistent with a diagnosis of dysgraphia," she did not find it necessary to assess Per to determine whether dysgraphia was an appropriate diagnosis.

Per testified at the hearing on his own behalf regarding his educational struggles while a student at KISD. Per explained that he has weaknesses in spelling, the ability to read with understanding, and organizing written material. He claimed that KISD officials responded to his unusual disability in

No.  10-20694

a "generic" and "catch all" fashion, pushing him into the regular curriculum without "concern" for his special disability.

Per stated that he tried to use the portable speller, but realized that it was an inadequate tool to help him overcome his very limited understanding of language.  Per described in detail why the functioning of the portable speller was so unhelpful to him. Per would first enter into the speller what he believed was the accurate spelling of an entire word; based on this input, the speller produces a list of possible words.  If any part of the inputted spelling were incorrect, the list of responses from the speller would "take [him] dramatically off course." When using the speller, Per essentially resorted to "guess[ing]" how to spell words, re-spelling "over and over again until [he found] what [he thought was] the word."  Per testified that he did not use a speller at Landmark School, where he had made significant progress, as he considered it a crutch which impeded his learning how to spell.

Additionally, Per testified regarding a number of educational approaches employed by KISD which enabled him to pass his courses while bypassing his area of weakness.   For instance, Per suggested that, because he was quiet, teachers did not always notice when he did not turn in essays or homework assignments.  The use of multiple choice and fill-in-the-blanks worksheets for class assignments obscured his difficulties with spelling, organization, and writing.  Per also "rel[ied] heavily on other people[,]" notably his parents and brother, to assist him with take-home writing assignments.  Without their help, he surmised, he "would have failed a long time ago in English classes."

Per further testified that he did not realize how ill-prepared he was to enter the real world until his senior year of high school at KISD, when he began to consider his college options.  Only then did he realize that he was unable to complete his college admissions applications without the assistance of his parents.  Until this point, he "was held under the delusion [that] all you have to

26

do to get ready for college is finish high school." He informed his ARD committee that he felt unprepared for college because of his deficits in writing and spelling. He was met with surprise from KISD officials. Per testified that he was never counseled regarding post-high school transition planning.

Per's mother, Signe Hovem, testified that she witnessed her son experience a breakdown as he attempted to complete his college applications, "inconsolable" because of his inability to do so. Mrs. Hovem explained her belief that KISD officials were not motivated to address Per's area of weakness because of his strengths in other areas. She noted, however, that "[b]ecause he is intelligent did not diminish the fact that he had needs." Mrs. Hovem further testified that she and her husband were misled as to the extent of Per's difficulties by the good grades he received and school administrators' praise for his progress. Her testimony, which was quoted by the district court in its written decision, dispel's KISD's suggestion that Per and his family are aggrieved by their own unrealistic expectations that school officials might cure his disability and maximize his performance:

> We are not asking for the most optimal maximized potential that you keep trying to drag out of witnesses. We are asking that he can function at a sixth grade level. We want to--We don't even know if he can do that, but we want to have the chance to try, just the chance to see, to prove to ourselves.

Considering the totality of the facts before the district court and hearing officer, it is obvious that Per's educational plan was not individualized and not tailored to enable him to obtain meaningful educational benefit. Alarmingly, KISD offers no reason why the IEP of an 18-year-old student, with a 142 IQ, who was unable to even complete a sentence within a reasonable time, was totally unresponsive to his problem. In lieu of explanations, KISD casually asserts on appeal, as it did without success before the district court and hearing officer, that it did all that it was required to do for Per under the IDEA by promoting

him toward graduation in the regular curriculum, a contention that the majority wholly accepts. In the face of the stark gulf between Per's academic potential, as reflected in his high IQ score, and his inability to complete simple sentences on an admissions form, the majority readily embraces KISD's argument, in support of doing effectively nothing in the face of Per's enormous challenge, as its own. As the facts delineated above so clearly demonstrate, KISD cannot and did not discharge its statutory responsibility merely by offering Per a diploma at the end of his high school career. More was required, as the district court and hearing officer correctly held.

KISD attempts to frame the dispositive issue in this case as whether it was obligated to "cure" Per of his disability. Were that the question before us, the answer would clearly be no. Instead, the question we must decide is whether KISD's educational program was individualized to address Per's specific needs, tailored to provide meaningful educational benefit rather than merely trivial advancement. Given the undisputed facts set forth above, I conclude that the answer is no.

## IV.

The policy implications of the majority's opinion are even more troubling. Citing *Rowley*, the majority reasons that educational benefit in the area of disability is not a primary concern under the IDEA. Rather, the majority asserts, the IDEA's ultimate goal is the conferral of benefits by the "holistic" educational experience. Accordingly, a school district satisfies its statutory obligation to a disabled child by educating him in the regular classroom and advancing him toward graduation, even if the school did not address his disability and made no effort to do so. Thus, in the majority's view, regular education is necessarily a sufficient educational benefit under the IDEA, regardless of the response, or the lack thereof, to the student's special needs.

No.  10-20694

There are numerous flaws with the majority's reasoning.  First is its over-reliance on and misunderstanding of aspects of *Rowley*.  In *Rowley*, the Supreme Court ruled that, in light of the district court's factual findings that a deaf student was receiving an adequate education and easily advancing in grade level, and "that [the student] was receiving personalized instruction and related services calculated by . . . school administrators to meet her educational needs, the lower courts should not have concluded that the Act requires the provision of a sign-language interpreter."  458 U.S. at 210.  Accordingly, *Rowley* stands for the proposition that, where courts determine that the individualized education plans afforded to disabled children are adequate, "courts must be careful to avoid imposing their view of preferable educational methods upon the States."  *Id.* at 207.

The majority disregards the nuance of the *Rowley* opinion, and instead treats *Rowley* as a blanket permission slip for federally-funded school districts to ignore the special needs of disabled students by affording them passing grades and advancement in the regular classroom.  Although in *Rowley* the Supreme Court "considered Amy Rowley's promotions in determining that she had been afforded a FAPE, the Court limited its analysis to that one case and recognized that promotions were a fallible measure of educational benefit."  *Hall by Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629, 635-36 (4th Cir. 1985) (citing *Rowley*, 458 U.S. at 203 n.25).

Promotion from grade to grade is less indicative of a disabled student's receipt of a FAPE where it appears that the student was promoted pursuant to a school policy rather than his achievement, where good grades are traceable to exemptions from standard expectations intended to circumvent rather than address his area of disability, and when independent evaluations contradict the amount of progress otherwise to be inferred from class promotion.  *See id.* at 636 (holding that "[t]he district court did not err in discounting [the student's]

29

No. 10-20694

promotions in light of the school's policy of social promotion and [his] test scores and independent evaluations"); *D.B. v. Bedford Cnty. Sch. Bd.*, 708 F. Supp. 2d 564, 584 (W.D. Va. 2010) ("Although the [hearing officer] observed that D.B. was promoted a grade every year, [he] failed to comprehend that this token advancement documents, at best, a sad case of social promotion."); *Nein v. Greater Clark Cnty. Sch. Corp.*, 95 F. Supp. 2d 961, 977-78 (concluding that, because dyslexic student "was graded on a modified scale and his tests and quizzes were modified, often being read to him aloud because he was unable to read them[,] . . . [his] promotions to the next grade level are not evidence of educational benefit . . . ."); *Smith v. Parham*, 72 F. Supp. 2d 570, 576 (D. Md. 1999) ("[A]dvancement from grade to grade should not be the only factor considered when determining whether a child is receiving an educational benefit."); *Carl D. v. Special Sch. Dist.*, 21 F. Supp. 2d 1042, 1053 (E.D. Mo. 1998) ("Achievement of passing marks and advancement from grade to grade are important- but not dispositive- factors in assessing educational benefit.").

In this case, there is plentiful evidence that Per's promotion in classes in which his disability affected his performance was due in large part to the school's policy of excepting his full participation rather than tailoring his instruction to address his disability. As expressed above, Per was in a posture to graduate only upon the school's waiver, on the basis of his disability, of the requirement that he pass the written component of the TAKS. Moreover, the battery of tests Per undertook as part of his application to the Landmark School provided measurable data that he was performing significantly below grade level in areas affected by his disability. Accordingly, Per's passing grades and presumptive graduation are insufficient to establish that KISD had provided him a FAPE.

Acquiescence to a disabled student's weaknesses, even if well-meaning, cannot obviate the requirements of the IDEA. Put otherwise, the fulfillment of a school district's obligations under the IDEA is not a matter of intention. It is

entirely reasonable to assume, as the majority apparently does, that KISD's employees believed that they were doing Per a favor by excusing his failure to complete written assignments legibly, timely, or even at all; by emphasizing his many strengths when grading his performance, yet ignoring his core weaknesses; by matriculating and promoting him through the general education curriculum toward graduation, in spite of the fact that, though he possesses an impressive intellect, he plainly displayed severe difficulty in producing even the most basic forms of written communication, such as words, sentences, and paragraphs, which average students produce with ease.

However, the IDEA requires that a disabled student's educational plan be "specifically designed to *meet* the child's *unique needs . . . .*" *Michael Z.*, 580 F.3d at 292 (emphasis added). The program of instruction "must be likely to produce *progress*, not regression or *trivial educational advancement.*" *Juan P.*, 582 F.3d at 583 (emphasis added). Clearly, social promotion of disabled students in the general curriculum, even if well-meaning, is inadequate to meet this mandate, both according to our established precedents and the plain language of the IDEA.

Moreover, the majority's approach ignores that graduation from high school in the regular education curriculum is not the singular purpose of the IDEA. Rather, the IDEA plainly requires that school districts prepare disabled students for life after high school as part of the IDEA's remedial scheme. Beginning not later than the first IEP to be in effect when a disabled student is 16, an IEP should include "appropriate measuarble postsecondary goals based upon age appropriate transition assessments related to training, education, [and] employment[,]" and "the transition services (including courses of study) needed to assist the child in reaching those goals[.]" 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb). Transition services are defined as coordinated sets of activities "designed to be within a results-oriented process, that is focused

No. 10-20694

on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education . . . ." 20 U.S.C. § 1401(34)(A).

Accordingly, as a disabled student nears the end of his public school education, transition planning becomes an integral part of the development of his IEP. The majority's contention that a school district does all that is required under the IDEA merely by graduating a disabled child, without even addressing his special needs, is belied by the statute's emphasis on transition planning and individualized transition services. A school district does not provide a FAPE to a disabled child who aspires to attend college merely by placing him in regular education classes without adequately individualizing his educational program to address his disability and prepare him for life post-graduation.

## V.

Because I would affirm the district court's conclusion that KISD failed to provide Per a FAPE, I would reach the issue of reimbursement for expenses associated with Per's education at Landmark School. The district court ordered reimbursement for Per's private educational expenses, with the exception of residential expenses. For essentially the same reasons cited by the district court, I would affirm this determination.

## VI.

The approach taken by the majority undermines the rehabilitative purpose of the IDEA by treating individualized education as an afterthought. The majority invites school districts to forgo measured, individualized mainstreaming of special needs students- a laudable goal under the IDEA- in favor of social promotion of disabled students unprepared for the difficult and sometimes harsh world that awaits them after high school graduation. In so doing, the majority rejects our precedents requiring deferential review of the

No. 10-20694

factual determinations of the district courts, and substitutes its own judgment for those of both the district court and the Texas Education Agency hearing officer. For these reasons, I respectfully dissent.